## SARAH E. BROWN ET AL.

### vs.

## WILLIAM A. HOGAN.

*Authority of Agent—Sale of Land—Power in Mortgage—Real Estate Broker—Contract of Sale.*

The mere relation of attorney and client does not authorize the attorney to sell property belonging to the client.        p. 259

A contract for the sale of land, executed by one as "attorney" for the owner, *held* not to have been entered into by virtue of a power of attorney contained in a mortgage previously given to him by the owner.                                        pp. 260, 261

The fact that, in a transaction between an attorney and his client, by which the former is authorized to sell the latter's property, there is no express authority to make a contract of sale binding on the principal, is evidence tending to show a lack of such authority.                                        p. 264

A verbal authority to make a contract does not authorize an agent to make one under seal.                                        p. 263

One authorized to make a contract for the sale of another's land must make a contract binding on the other party thereto, and if the contract purports to be executed by an agent in behalf of such other party under the latter's seal, authority under seal should be shown.                                        p. 265

One employed to find a purchaser for land, or "to sell" land, has, in the absence of express authority to that effect, no power to sign a contract of sale.                                        pp. 266-269

*Decided April 5th, 1921.*

Appeal from the Circuit Court for Prince George's County, In Equity (BEALL, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Ogle Marbury,* with whom were *Philip B. Perlman, Lloyd L. Jackson, Jr.,* and *Marbury & Perlman* on the brief, for the appellants.

*William Stanley,* for the appellee.

BOYD, C. J., delivered the opinion of the court.

The bill of complaint was filed in this case by the appellee to have a deed from David Shaffer to Walter Brown and wife, and a mortgage from them to Frank Brown, set aside, and to have a contract entered into between George P. Mc-Ceney, attorney for Shaffer, and Harry F. Frost on behalf of the appellee, specifically enforced. A decree was passed in accordance with the prayers of the bill and this appeal was taken by Walter Brown and wife and Frank Brown from that decree.

A contract was entered into between "George P. McCeney, attorney for David Shaffer," of the first part, and William A. Hogan, of the second part, by which the party of the first part undertook to sell to Hogan a house and lot in Laurel for the sum of $850, of which $150 had been paid before the signing of the agreement, and the balance was to be paid upon the delivery of the deed, the purchaser to have thirty days in which to complete the purchase and examine the title. The agreement, which was *signed and sealed* by "George P. McCeney" and by "H. F. Frost for W. A. Hogan," was dated October 20, 1919, and followed a verbal arrangement made a few days before between McCeney and Hogan. On the 26th of October, David Shaffer, who lived in Baltimore, agreed to sell the property to Walter Brown and Sarah Brown, his wife, for $900, and accepted $50 as part payment on that day, and later conveyed the property to them. Frank Brown loaned them, on a mortgage, $800 to be used in payment of the purchase money.

There can be no doubt that Mr. and Mrs. Brown knew before they purchased the property from Shaffer, and Frank Brown had ample notice before he loaned the money to them, that McCeney had, as Shaffer's attorney or agent, undertaken to sell it to Hogan. We will not, therefore, discuss that question, but will treat it as settled that the contract of sale executed by McCeney with Hogan is binding on all of them, if he had authority to make it. The important question, then, is whether McCeney was authorized to enter into that contract of sale, so as to be binding on Shaffer. His right to sell the property, of course, cannot be based merely on the fact that he was the attorney for Shaffer in the settlement and division of his father's estate or in other matters, unless he had some authority other than that arising from the ordinary relation of attorney and client, but the plaintiff relies on what is spoken of as a power of attorney, and also on a special power to sell this property given McCeney in September, 1919.

On September 17, 1917, Shaffer borrowed some money from McCeney and gave him a mortgage on all of his interest in the property which he inherited from, or was left to him by the will of, his father, and another property he owned, to secure $125, which was payable three months after date. The mortgage included the usual covenants and power of sale in case of default and then immediately following the power of sale was the power of attorney relied on by the plaintiff. Although there is no copy of the mortgage in the record the terms referred to without objection and the power of attorney was read into the record by Mr. McCeney when he was on the stand which is as follows:

"Or in case of default as hereinabove set forth, instead of having the said property sold, the said mortgagee, his successors or assigns, may elect as long as he or they choose, to take possession of, manage and conduct the mortgaged property under the following power: *i. e.*, I do hereby constitute, nominate and appoint George P. McCeney, of Prince George's County,

State of Maryland, to be my true, sufficient and. lawful attorney, irrevocably for me in my name and stead to sell, exchange, convey, mortgage or lease, and in all manner to dispose of, charge and manage any and all of the real estate, leasehold or other property mentioned in this mortgage for the purpose of satisfying this mortgage, or the two preceding mortgages mentioned in this mortgage, and for me and in my name and stead to execute and acknowledge according to law, any and all conveyances and contracts which he may deem necessary and expedient for the above purposes or what may be required by law for the purpose of this power of attorney, and also to collect all rents or sums of money which may be or become due to me, and to give receipts therefor in my name and pay all taxes * * *."

It then concludes in what may be said to be the usual form of such instruments. Without feeling called upon in this case to determine how far a mortgagee would be permitted to take possession of mortgaged property and act under such a power of attorney, inserted in the mortgage, it is clear that McCeney did not take possession of the property and act under that power. It is shown that at the time the mortgage was given there was an equity proceeding for a partition or division of some kind which resulted in certain properties, including the one in controversy, being conveyed to David Shaffer by the executors of his father's estate about the middle of June, 1919. At that time the properties which were allotted to David Shaffer were valued at $11,000, and were subject to about $5,000 of liens. The mortgage to McCeney was in default from its maturity, but it would have been very inequitable for him to take possession of all these properties and hold them until his mortgage was paid. McCeney did not attempt to so hold the properties and he did not sell any of them under that power. He testified that several persons approached him about purchasing some of them, and he talked to Mr. Shaffer, but he would not sell them, and "that wit-

ness did not sell any property when a man came to see him unless he asked Mr. Shaffer, because he was his attorney as well as mortgagee." In the sale of what he spoke of as the Beall purchase, Mr. Shaffer refused to let him sell it at the price Beall offered, and then afterwards sold it himself to Beall for that price. Mr. McCeney added "that was the only property sold that I participated in." In point of fact he examined the title for Mr. Beall. The mortgage had been in default for nearly two years when McCeney agreed to sell this property to Hogan, but there is no reference in the contract of sale to the power of attorney, or intimation that he was selling by virtue of it. It was proven that William C. Shaffer, a brother of David, collected rent from Walter Brown, who was the tenant, made the repairs and had been negotiating for some time with the Browns for the sale of the property. Indeed, on October 14, 1919, he wrote to his brother "that W. Brown wants to buy the house where he lives and thinks he should have first chance on it." In the absence of his brother, who lived in Baltimore, he represented him, and judging from what he did, the public might well have regarded him, and not McCeney, as the bill alleges, as the agent of the property—especially as he was one of the executors of their father's estate and had been collecting the rents from Brown both before and after the deed was made to David. But as we think it is clear that the contract of sale was not entered into by virtue of the power of attorney in the mortgage, we will not discuss that branch of the case further, but will call attention to the fact that the language of the letter which Mr. McCeney wrote to Mr. Shaffer does not indicate that he wanted to sell the property under the power of attorney.

That letter was dated December 22, 1919, and addressed to Shaffer in Baltimore. It is as follows:

"Will you please let me know if you desire to sell the little house on Montgomery Street that you own and is occupied by Brown? The property was ap-

praised at $750.00. If you desire to sell this property;
please let me know what your lowest cash price is and
I believe that I may be able to sell it."

McCeney testified "that in response to that letter Mr. Shaf-
fer came to his office, and after a conversation he agreed to
sell it for $850; that the party to whom he was talking at
that time did not take it; he thought it was too high." On
cross-examination he was asked: "Do you recall exactly what
he said about selling the property? A. I could not tell you
*verbatim.* I know he came into my office and wanted to talk
about that piece of property. He said it ought to bring $850.
That is what he would take for it." He said he did not think
that any time was mentioned within which he wanted it sold,
but "I am positive there was no time mentioned as to how
long a time was given me to sell or close this deal." He was
asked: "Did he give you the exclusive right?" and replied:
"He did not give any exclusive right. When he came into
my office he told me the price was $850, and he told me prac-
tically, 'Go ahead and sell it.' " When he wrote the letter to
Shaffer another man was inquiring about the property. He
declined to take it and shortly afterwards Hogan called to
see him about it, and he (McCeney) signed the contract in
duplicate and sent the two copies to Mr. Frost, who signed
them for Hogan and sent them and a check for $150, the cash
payment, to him, but he did not actually receive them until
October 25, as he was away from home. He did not notify
Mr. Shaffer what he had done until after Mr. Shaffer had sold
the property to the Browns, not until he did by his letter of
October 29, when he told him he had sold it to Hogan.

Mr. Shaffer testified that he went to see McCeney after he
received the letter of September 22, that he said to him: "Mr.
McCeney, in case you can close this deal, when will I hear
from you? He studied a little bit and he said, 'Why, I think,
Dave—or Mr. Shaffer—inside of two weeks I think we can
close the matter up.' Just that way. I said, 'All right, Mr.

McCeney, go ahead. Let it go.' We walked out to the elevator. We talked about this deal. I told him I would like to have the money, and let me hear from him as soon as possible." He said he heard nothing more about it until Mrs. Brown came to see him on October 26th, and in reply to her inquiry, he told her it was not sold. He said he took it for granted he would have heard if it had been sold and he did not hear from Mr. McCeney until the letter of October 29th; that if McCeney made a sale he expected to hear from him and to sign the contract.

There is no very material difference between the two as to what was said about the sale of the property, except Shaffer testified that McCeney said he thought it could be sold within two weeks, while McCency did not remember stating the time, but he was positive he was not limited to two weeks in which to make the sale, and the statement of Shaffer quoted above only shows that McCeney thought it could be closed in two weeks. If McCeney had notified Shaffer, as he ought to have done, that he had sold the property, it would have probably avoided this controversy, although if Shaffer had acted more prudently, and inquired of McCeney whether he had sold the property, before selling it to the Browns, he might have avoided trouble.

As Mr. McCeney testified that Mr. Shaffer did not give him an exclusive right to sell, and he knew he was anxious to have that property sold at once, he ought to have notified him what he had done. He testified that he told Hogan on the 13th of October that he could have the property and, either that night or the next day, he prepared the contract in duplicate, signed the two copies and left them with Mr. Frost, who was to act for Hogan, to be signed. As it had then been about three weeks since Shaffer authorized him to sell the property, it was not only fair to the purchaser but to Mr. Shaffer that he should be notified of what he told Hogan, and he could have sent the contracts to Shaffer to be signed. He lived in Laurel, which is a short distance from

Baltimore, and he had an office in Baltimore, where Shaffer lived. He knew Hogan had to arrange with the building association from which he was to borrow the money, and there need not have been any delay in the matter from sending the contracts to Shaffer. They were not dated until the 20th day of October by Mr. Frost, and Mr. McCeney did not, by reason of his absence, get them until the 25th. He was asked on cross-examination, "This is the first sale that you actually consummated yourself of any of his property? A. Well, yes. The other was sold for the same figure, but he closed it behind me. I disclosed the name of the purchaser and he closed the deal. In this case he did not know the name of the purchaser, or probably he would have gone behind me." That reply is very suggestive of a reason for not disclosing the name of the purchaser, and he did not notify his client of the verbal agreement he made on the 13th day of October, or of the written agreement, until by his letter of the 29th— after he had heard that Shaffer had sold the property to the Browns. If he had a client whom he could not trust, he could readily have protected himself by obtaining proper authority to sign the contract, before he undertook to make a sale, which would have avoided this trouble. While it is true that, in this State, an agent may be appointed by parol to sell real estate, *Small* v. *Owings,* 1 Md. Ch. 363; *Baker* v. *Wainwright Bros.,* 36 Md. 336; *Moore* v. *Taylor,* 81 Md. 644, it does not necessarily mean that he can make a contract of sale which is binding on his principal. If such is the intention of the parties, it is so easy to say so, that if, in a transaction between an attorney and his client, it is not provided for, that omission is some evidence that it was not intended to give such power. In addition to that a verbal authority to make a contract does not authorize an agent to make one under seal. It is true that in *Horner* v. *Beasley,* 105 Md. 193, which was an action of *assumpsit* for the breach of a contract for the sale of a house and lot, we held that "where the sealed contract would be good as a simple

one it will not be rendered invalid by the presence of the seal which may be rejected as surplusage and the contract treated and sued upon as a simple contract," and JUDGE SCHMUCKER, in speaking for the court, added: "This is especially true where the principal has recognized or ratified the contract which has been made by his agent," as was done in that case. But cases might arise where it would give considerable trouble, on the question of the statute of limitations for instance, and at any rate we refer to the execution of this contract under seal to show that it was attempted to be executed in a way that was clearly not authorized. There might well have been a question as to whether Hogan was bound, as the contract was signed, "H. F. Frost, for W. A. Hogan (Seal)." See 1 *Poe, Pl. & Pr.,* Sec. 358, quoted with approval by JUDGE BURKE in *Manning* v. *Embert,* 126 Md. 545.

By reason of the conclusion we have reached, it may not be of great importance to consider the mere form of the contract which McCeney made, although it is well settled that even when authority is given to the broker or agent to make a contract it must be in accordance with the authority given him, and he cannot in any material matter leave out or add to the power given him. If he is authorized to make a contract, he must at least make one which is binding on the other party, and in view of what is said in 1 *Poe,* referred to above, it could hardly be said that Hogan was bound by that contract, as no authority under seal is shown to have been given Mr. Frost, even if the mode of signing be not objected to. It is true that Hogan is not seeking to avoid the contract, but asks to have it enforced, but McCeney's principal had the right to a contract which would be binding on the purchaser, and not left to his option whether he would or would not be bound, if McCeney was authorized by Shaffer to make one for him.

But we are of the opinion that he was not authorized to make a contract of sale. It is certain that he was not expressly authorized by what the record shows the authority was.

Unless there were some circumstances which take the case out
of the rule of law established by the great weight of authority
in this country in reference to real estate brokers and agents,
this contract was not binding on Shaffer. There are two dis
tinct lines of cases on the question, but those which hold that a
broker or agent has an implied power to make a contract of
sale of real estate, when he is authorized to obtain·a purchaser
or to sell, are greatly in the minority. The case of *Lawson*
v. *O'Hara,* 98 Minn. 71, is annotated in 8 *Ann. Cas.* 851.
It is said in the principal case: "The authorities with prac-
tical unanimity hold that an employment to find a purchaser
for certain land on prescribed terms does not authorize the
broker to execute a contract of sale," citing some English
·cases and a number from this country. That court then went
·on to say: "By the very decided weight of authority the rule
is the same where the broker is authorized 'to sell' the land."
It then refers to *Halsey* v. *Monteiro,* 92 Va. 581, which prac-
tically quoted from *McCullough* v. *Hitchcock,* 71 Conn. 401,
where, after defining what a real estate broker or agent is,
the latter court said: "He has no authority to bind the prin-
cipal by signing a contract of sale. A sale of real estate in-
volves the adjustment of many matters besides the fixing of
the price. The delivery of the possession has to be settled;
generally the title has to be examined; and the conveyance,
with its covenants, is to be agreed upon and executed by the
owner. All of these things require conferences, and time for
completion. These are for determination of the owner, and
do not pertain to the duties, and are not within the authority,
of a real estate agent. For these obvious reasons, and others
which might be suggested, it is a wise provision of the law
which withholds from such an agent, as we think it does, any
implied authority to sign a contract of sale in behalf of his
principal." While some of those reasons may not be deemed
of great importance in ordinary transactions, some are and
others might be mentioned. For instance, under such de-
cisions as *Brewer* v. *Herbert,* 30 Md. 301; *Skinner & Sons*

*Co.* v. *Houghton,* 92 Md. 68, and others which might be cited, when there is a valid contract of sale, the beneficial ownership of the property is in equity vested in the vendee, and insurance policies taken out by the vendor may be avoided, unless, of course, the change of interest is consented to by the insurer. If an agent can execute a contract of sale under such supposed authority as is relied on here, then not notify the vendor of the sale and not let him know who the vendee is, the vendor may be subjected to great loss, if the vendee is not financially responsible and a fire occurs after the execution of the contract of sale. Then, as happened in this case, the vendor may be placed in the awkward position of selling the property himself after the agent has sold it, in addition to the risk of either having something inserted in or omitted from the contract, which he was not willing to have done. It is, therefore, much better for everybody that it be clearly and unequivocally stated in his contract of employment with his principal, and that the terms of sale be made explicit, if the agent is to have authority to make a contract of sale, and if such authority is not given him, then the sale must be reported to the owner and the contract executed by him, if one is desired.

. The annotator in 8 *Ann Cas.* 851, *supra,* declares the rule to be in substance as stated above, and cites cases from many states and the District of Columbia. He refers to a few to the contrary, which hold that authority given to the broker to sell property includes an implied power to do everything necessary to effect a sale, and therefore empowers him to enter into a contract of sale on behalf of the owner. *Springer* v. *City Bank,* 59 Col. 376, is in accord with the majority, and a great many decisions made after those cited in 8 *Ann. Cas.* are referred to in support of that view in the note to that case in *Ann. Cas.* 1917 A, 523. Amongst those cited is *Record* v. *Littlefield,* 218 Mass. 483, 106 N. E. 142, and the annotator there refers to it: "wherein it appeared that an owner orally instructed a broker to find a purchaser for cer-

tain property, and later the broker informed him that a purchaser on the terms stipulated had been found, it was held that the owner's direction then given, 'It is all right, go ahead,' did not include authority to make a contract in writing in accordance with the proposed terms of sale which would bind the owner." A few cases to the contrary of the general rule are cited in that note. See also 2 *C. J.* 614-615 and notes; 9 *C. J.* 526 and notes; 4 *R. C. L.* 262, par. 14; 23 *Am. & Eng. Ency. of Law,* 901; 1 *Mechem on Agency,* 797.

In *Clark* v. *People's Bank,* 136 Md. 263, where the agent. was authorized to rent property and find a purchaser, and without authority gave the tenant the right to purchase it, at a price fixed, at any time during the term of the lease, we held that the owner was not bound and affirmed the lower court, which had refused specific performance. JUDGE THOMAS. quoted from *Milne* v. *Kleb,* 44 N. J. Eq. 379, 14 Atl, 647; *Spengler* v. *Sonnenberg,* 88 Ohio St. 192, 102 N. E. 737, Ann. Cas. 1914D, 1083; and *Crumpacker* v. *Jeffrey,* 63 Ind. App. 621, 115 N. E. 62, which sustained the rule as to real estate brokers or agents not having the right to execute a contract of sale, unless specifically authorized to do so. It is true that he said that we were not required to go to the full extent of those authorities in that case, and, of course, it was not necessary, as there the question was whether the agent had exceeded the authority given him in respect to what we have stated, but the full quotation from two of them and a pointed excerpt from the other were significant to say the least. There are a number of other cases in this State in which the question was whether the agent or broker had authority to do the particular thing involved in the respective cases, but we have found none directly on the particular question before us. In *North Ave. Casino Co.* v. *Ferguson,* 130 Md. 376, Section 17 of Article 2, as to the rights of brokers to commissions is referred to, and we call attention to the language of that statute, as it was passed to settle the question so often raised, as to when, in the absence of a special agreement, the broker was entitled

to commissions. It will be observed that, in the absence of a special agreement to the contrary, when a broker employed to sell, etc., procures in good faith a purchaser, etc., and he is accepted as such, by the employer, "and enters into a valid, binding and enforceable written contract of sale * * * in terms acceptable to the employer, *and such contract is accepted by the employer and signed by him,* the broker shall be deemed to have earned the customary or agreed commission," etc. That statute is significant, inasmuch as it is shown that the contract is to be accepted and signed by the owner. See also *Boswell* v. *Hostetler,* 129 Md. 53, where "the conversation was entirely too uncertain, vague and indefinite to constitute a contract upon which a recovery could be based," the contract in writing having expired, and *Coppage* v. *Howard,* 127 Md. 512, where many authorities are cited. There no contract of sale was executed by the owner and the purchaser, and it was held that a broker who failed or refused to disclose the name of the purchaser he had procured could not recover commissions. There are many other cases in this State in which real estate brokers or agents have sued to recover commissions, but they do not directly affect the question before us and we need not cite them.

We have not referred to the question of custom as to the broker or agent executing the contract for his employer, as there is no evidence of any custom before us. Of course, in what we have said, we do not mean to suggest that a broker or agent should not have the purchaser sign a contract, which is to be submitted to his employer for his approval and signature, but unless authorized by his contract of employment to sign a contract of sale so as to bind his employer, a broker or agent cannot so bind him.

As is said in the note in *Ann. Cas.* 1917 A, 524: "While the power of a real estate broker or agent ordinarily extends only to finding a purchaser, it has been held that if the language used by the parties or in the instrument with reference to his employment, regarded in the light of surrounding

circumstances, clearly shows that the broker is authorized to contract for the sale of the property, the contract may be enforced against the owner." See also 1 *Mechem on Agency,* Sec. 798. Having that in mind, and understanding that Mr. McCeney is an attorney at law and not a regular real estate broker, we have carefully examined the authorities and considered surrounding circumstances with the view to seeing whether under them, there could be applied to him, as an agent for the sale of this property, a different rule from that announced by what we have spoken of as the great weight of authority, but we find nothing that would justify us in holding that the rule is not applicable in this case.

Being of the opinion that under the circumstances shown by the record Mr. Shaffer was not bound by the contract of sale Mr. McCeney executed, the decree of the lower court must be reversed.

*Decree reversed and bill dismissed, the appellee to pay the costs.*