[No. 29851. *En Banc.* January 10, 1947.]

NORTHWEST POULTRY & DAIRY PRODUCTS COMPANY, *Respondent,* v. A. C. FRY COMPANY et al., *Appellants.*[1]

[1]Reported in 176 P. (2d) 324.

*McMicken, Rupp & Schweppe,* for appellants.

*Newman & Cook, Peyser & Bailey,* and *Eugene J. Mulholland,* for respondent.

ROBINSON, J.—In November, 1944, the A. C. Fry Company, a corporation, owned as its sole asset a building in Seattle which had been rented for several years to certain persons doing business as Olympic Sausage Company. By its terms, its lease was to expire in December.

The Fry Company had five thousand shares of stock. In November, 1944, Raymond R. Fry held 1,667 shares, his brother, Earl A. Fry, 1,666, and Oliver Hulback, a Seattle attorney, held 1,665 shares, not, however, as owner thereof, but as a *nonintervention* executor of the will of A. C. Fry and Annie R. Fry, the deceased father and stepmother of the two brothers above named. Mr. Hulback, who had been attorney and a director of the company for more than forty years, and Martha G. Fry, wife of Raymond R. Fry, each had one share, qualifying them as directors. Upon a settlement and closing of the estates of A. C. Fry and Annie R. Fry, the 1,665 shares held by Mr. Hulback as a fiduciary will be equally divided between Raymond Fry and his wife Martha, and a former wife of Earl A. Fry. At the time that this controversy arose, Raymond Fry was president of the corporation, Martha Fry was secretary, and these two, with Mr. Hulback, constituted the board of directors.

Mr. Lee Newman, an attorney and a member of the then firm of Hill, Newman & Cook, now Newman & Cook, was Earl Fry's attorney, having been so employed about three months before. Earl Fry lived in Connecticut. At some time not shown in the record, he gave Mr. Newman a general power of attorney. Earl Fry was of the opinion that there had been unnecessary delay in closing the estates of his father and stepmother, and Mr. Newman was employed to take the matter up with Mr. Hulback. Newman did so, and states that there were some "caustic conversations"

between Mr. Hulback and himself. Mr. Newman's client also thought that the building should be sold and the corporation wound up. Mr. Newman had some conversations with Raymond Fry and found him of that opinion also, provided, however, a price of forty thousand dollars could be obtained. These conversations occurred sometime in November.

On November 21st, Newman learned from Henry Broderick, Inc., a long-established real estate firm, that a client of theirs, who turned out to be the Northwest Poultry & Dairy Products Company, the plaintiff in this action, desired to rent, or might possibly buy, the Fry building. A day or two thereafter, Mr. Pauli, an agent of the plaintiff, went to see Mr. Newman, he says, at the suggestion of Raymond Fry. This would seem highly probable, since Raymond Fry knew that his brother Earl was advocating a sale of the building and was pressing the matter through Mr. Newman, his attorney. Furthermore, Mr. Pauli's evidence is corroborated by Mr. O'Brien, a member of the Broderick staff, who was called as a witness for the plaintiff. He testified that, about the twenty-third of November, Mr. Pauli, who desired to purchase the building for the plaintiff, made an offer of $32,500 to Raymond Fry in their office, and that Raymond Fry expressed an opinion that it was not enough, but said that he would take the matter up with Mr. Newman. This was the first time the Broderick office knew that Newman had any connection with the matter. On examination, Mr. O'Brien testified as follows:

"Q. Did Mr. Raymond Fry at any time in any of the conversations, which you have just testified to, indicate that you, or say to you specifically that Mr. Newman was the attorney for the A. C. Fry Company? A. No, sir. Q. Did he say he was his attorney individually? A. No, sir. Q. Nothing about attorney, did he? A. He said that he would take the matter up with Mr. Newman."

The above testimony is quoted for the reason that Mr. Pauli's supposition that Mr. Newman was attorney for the A. C. Fry Company seems to have been based entirely upon the suggestion of Raymond Fry that he see Mr. Newman.

There is no evidence in the record that anyone other than Mr. Newman ever told Pauli that Newman was attorney for the corporation.

The Broderick firm now began to work on Mr. Newman. A Broderick agent telephoned him the next morning, and, at his request, furnished him a memorandum of what was said and done at the meeting in their office. This memorandum stated that they had had a conversation with Raymond Fry and Pauli the day before, and that Mr. Pauli had offered three hundred seventy-five dollars per month for a five-year lease, stating further particulars and interpolating:

"Mr. Fry stated that he thought the rent should be $400.00 per month and that he would rather sell for $40,000.00 as far as he individually was concerned, and requested that the writer get in touch with you."

Mr. Pauli testified that Mr. Evans told him that Mr. Newman would like him to call at his office, and he did so. Mr. Newman, having been informed that Raymond Fry wished to sell if forty thousand dollars could be obtained, and his own client, Earl Fry, also wishing to sell, urged Pauli to make an offer to purchase. Pauli indicated that he would offer. $32,500. Newman at once told him that that would not be considered. Pauli returned in a day or two, and, according to his testimony (while under examination by Mr. Newman), about the twenty-fifth or twenty-sixth of November, or two or three days later, and after some conversation, Newman said:

" 'Let's stop kidding along, what is your top offer?' and I made the offer then of $35,000, and us to pay whatever commission was necessary to take care of the Henry Broderick Company. . . . and we made the various stipulations in this first agreement, that you drew up for me on December 1st. Q. And then you made the offer of fees, first; and we agreed to type it for you in my office? A. That is right. . . . Q. (By Mr. Newman) Was the first offer signed December 1st or 2nd, Mr. Pauli? A. December 1st, I believe. Q. And the check was written when? A. December 2nd. Q. And what did you do with that check? A. *There were a couple of stipulations in this December 1st agreement that I didn't like, and we drew up a subsequent*

*agreement in another meeting, under date of December 4th."*
(Italics ours.)

The offer was formally written up by Mr. Newman for Mr. Pauli on the letterhead of the then firm of Hill, Newman & Cook, and was executed by Mr. Pauli for his principal. It is in the record as exhibit No. 1, and reads as follows:

"A. C. FRY COMPANY "December 1, 1944
"MR. OLIVER HULBAC*h*, Executor
"of the Estate of A. C. Fry and
"of the Estate of Annie R. Fry
"Mr. Earl Fry
"Mr. Raymond R. Fry
 "Re: PURCHASE OF A. C. FRY BUILDING
"Gentlemen:

"The Northwest Poultry and Dairy Products of Oregon, a Corporation, hereby offers Thirty-five Thousand Dollars ($35,000.00) cash for the following described real estate: [Here follows a legal description of the property] together with the building thereon, and all refrigeration equipment and all other equipment therein, and any and all other improvements and appurtenances thereunto belonging, owned by you, subject to the right of inspection and approval by Mr. C. W. Norton, and subject to a survey at our expense, showing the A. C. Fry building to be on said lot.

"Possession is to be taken by January 1, 1945, or within a very reasonable time thereafter. It is understood you will try to arrange with the tenants an accommodative entry and rights of ingress and egress so that repairs can be made on said building prior to the time of taking full possession, and after approval by Mr. Norton and after said survey.

"All of the above is subject to a land survey to be made, and final approval of sale to be given by Mr. C. W. Norton, President of the Northwest Poultry and Dairy Products Company of Oregon, within ten (10) days of date hereof.

"Taxes and insurance to be prorated as of date of our taking possession.

"Owners to deliver premises free and clear of incumbrances and tenants by January 1, 1945, or within a reasonable time thereafter, and owners are to pay for Title Insurance and Revenue Stamps and proper deed.

 "Very truly yours,
 "THE NORTHWEST POULTRY & DAIRY
 "PRODUCTS COMPANY OF OREGON
 (Signed) "By: F. E. Pauli"

We have quoted the above in full in order that we may show a complete history of the transaction. Actually, the instrument is not of great importance, for the following reasons: (1) No copy of it was sent to the Fry Company, or to Mr. Hulback, or to Raymond Fry, and there is nothing to indicate that they ever knew its content (except as Newman related it to them over the telephone) until they saw it set out in the complaint served upon them in this action. (2) As we have already seen, there were a couple of matters in it that Mr. Pauli did not like, and he had Mr. Newman draw up a subsequent offer and agreement in another meeting on December 4th, either before or just after the execution of exhibit No. 1. Mr. Newman undertook to persuade Mr. Hulback and Raymond Fry that the offer should be accepted. According to Mr. Newman's testimony, the following occurred:

"A. . . . I knew Earl wanted to wind this up. I knew he wanted to sell, didn't want to rent. MR. MILLER: If the Court please— A. I called Mr. Hulback and discussed that with him. THE COURT: You told Hulback that? A. I said, 'You know we want to sell it.' He said he understood that. I said to Mr. Hulback— THE COURT: You told him Earl wanted to sell? A. Yes. I know Hulback and Ray Fry in any professional conversations assured me they wanted to sell it for $40,000; and I said to Mr. Hulback, 'Here is an offer of $35,000 cash, with the broker's commission being paid by the purchaser, which is tantamount to approximately,'—this is almost exactly the language I used, 'approximately $40,000 offer with a 5 per cent commission deducted; the purchaser further is willing to have the building surveyed at his expense. We have to get the tenants out.' . . . Q. Restrict yourself to this conversation with Hulback at that time. A. So Mr. Hulback and myself discussed the wisdom of the $35,000 cash offer, whereupon Mr. Hulback said to me, 'What is that going to cost? What are your fees?' I said to him, well now, I don't recall whether I said $500 or $250 a piece to Mr. Hulback, the executor of the estate and Mr. Ray Fry, but I said, about $250 a piece, let us say. He said, 'That is very reasonable. That is very fair.' And I said, 'What do you think?' He says, 'Go ahead, make the deal. It is all right with me.' I said, 'How about Ray?' Well, he said, 'You call Ray yourself.' I called Ray.

Ray is working as a clerk, I understand, in Judge Hodson's Police Court; that traffic violation bureau—I usually call the police court and ask for traffic violation and then get a hold of Ray. I said, 'Say, Ray, we have a net offer now.' By the way, Ray didn't give me a chance to answer, to state. He said, 'We have got a net offer of $35,000,' and his attitude was pleasure and enthusiasm. Q. Did you tell him that, or did he— A. Well, he told me first about the $35,000. My recollection is he told me with the, in the language of the vernacular, and I thought to myself, and said to Ray, 'Well, you don't think that you have— Mr. Miller: If the Court please, what he thought— The Court: He said he said it to him. No objection to that. A. 'You don't have the desire to take the credit for that too,' because I was thinking of his getting a hundred dollars a month which was a question between the brothers. And I heard his, Ray's statement to me there had been a cash offer of $35,000, the purchaser to pay the brokerage fee. We were to pay the title insurance and the stamp tax, and so on. I urged Ray to accept. The Court: Do I understand before you could tell him he told you? A. Yes, yes. Q. (By Mr. Peyser) Did he say— A. (Interposing) I understood he got that information from Henry Broderick's office, and I then said to him, 'Now, Ray, let me tell you how this happened.' And Ray, I informed him about Mr. Pauli and myself having had these conversations, and little silly to have to admit to Mr. Pauli now because he didn't know this, but I had boosted the price to $35,000 less the brokerage commission; and the title insurance was to be paid by us. I related these other facts to Ray and Ray indicated that was fine, go ahead and make the deal. And then I called Mr. Pauli in. I mean, I called him on the telephone, as I recall it, or made an appointment and he called me on the phone. Q. I would like to sew up a little bit better, can you remember the precise language he used in approving the deal and advising you to go ahead? A. Mr. Hulback said—Q. (Interposing) Not Hulback, you got that. A. Ray said, 'That is fine. You go ahead and make the deal.' Just in those words because we had been talking over the telephone for pretty near ten days. This was in the brew. They wanted to sell. We wanted— The Court: What he asked you was, what did he say? Mr. Peyser: That is what he said. The Court: His words, that is fine, go ahead and make the deal?"

Basing its contentions on these telephone conversations, which were to a considerable extent, particularly as to the

one with Raymond Fry, corroborated by other witnesses, but in no way enlarged as to substance, the respondent contends that Mr. Newman and the then law firm of Hill, Newman & Cook became (1) attorneys for the A. C. Fry Company, a corporation, (2) for Oliver Hulback, executor of the estates of A. C. Fry and Annie R. Fry, and (3) also personal attorneys for Raymond R. Fry; and that Mr. Newman, having a power of attorney for Earl Fry, was fully vested with the power to enter into a specifically enforcible contract to sell and dispose of all of the assets of the A. C. Fry Company, a corporation.

On December 4, 1944, at the request of the respondent, the following instrument (exhibit No. 2) was prepared by Mr. Newman on his firm's letterhead, and executed as shown:

"MESSRS. HILL, NEWMAN & COOK December 4, 1944
"1618 Northern Life Tower
"Seattle 1, Washington
"ATTORNEYS FOR:
"A. C. Fry Company
"Mr. Oliver Hulbach, Executor of the Estate of
"Mr. A. C. Fry and of the Estate of Annie R. Fry
"Mr. Earl Fry
"Mr. Raymond Fry
"Gentlemen:

"The Northwest Poultry & Dairy Products Company of Oregon agrees to buy the real estate described in the attached for $35,000.00 as is, subject to the removal therefrom, within a reasonable time, of the tenants occupying the premises. It is understood and agreed that we are depositing $5000.00 with the Seattle First National Bank of Seattle, and that you will deposit a Warranty Deed with Title Insurance, free and clear, with the same bank. When the tenants are removed from the premises, (and we would rather agree to a short time extra in order that they may clean up around their respective premises), the bank will be authorized to deliver the $5000.00 to you, and the balance of $30,000.00 in exchange for the Deed and Title Insurance.

"The tenants intended to be covered by this letter are all the tenants in the A. C. Fry Building and removal of the Zeeb Building, which is situated on the western side of said Fry Building.

"In view of the fact that there may be a longer period than anticipated, say several months, to remove the Zeeb people and the building, we are agreeing to put up $5000.00 as earnest money. If the Zeeb people and the building are not removed within a reasonable time, say several months, the $5000.00 is to be returned to us and the Deed and Title Insurance are to be returned to you.

"The description of the real estate to be attached to this letter is the same as is in our letter to the Fry Company, etc., dated December 1, 1944, all subject further to a survey showing the building to be on the lot lines, and to taxes and insurance being pro-rated as of date of delivery.

> "Yours very truly,
> "NORTHWEST POULTRY & DAIRY PRODUCTS
> "COMPANY OF OREGON
> "By: [signed] F. E. Pauli"

[Handwritten]
"Accepted
"Hill, Newman & Cook
"Attys. for Addressees
"By L. L. Newman"

Obviously, the addressees are Hill, Newman & Cook, but, as that does not make sense, we think that the A. C. Fry Company, Mr. Hulback, the executor of the two Fry estates, Earl Fry, and Raymond Fry must have been intended. This, however, is a rather generous interpretation, since no copy was ever sent the alleged addressees, that is to say, to the corporation or to any of the individuals named, although it was produced and portions of it read at a corporation meeting held on December 21st, of which mention will be made later. It was testified, and not rebutted, that Mr. Newman even then refused to relinquish it or file it with the corporation. As above stated, that Mr. Newman never sent or gave a copy to the addressees, is not only proved by their own evidence, but by Mr. Newman's, who testified as follows:

"Q. There were a couple of these December 4th letters executed. Didn't the bank get one of them? A. Yes, they were executed, as I recall, in quadruplicate. . . . Q. (By Mr. Peyser) Pauli signed that, and you signed it. What did you both do with the copies? A. Then, I kept this one.

Several copies were signed; I gave one to Mr. Pauli; I kept one. We sent one down to the bank, . . . THE COURT: One to the bank. What became of the rest of them? THE WITNESS: I have one in my file. Well, now, my recollection is, I don't recall that distinctly, but gave two copies to Mr. —Portland, one to, one to send to Portland, apparently, which made copies enough. THE COURT: Did Fry get any? THE WITNESS: No, I didn't consider it necessary to give, because I had their oral agreement. I was acting as their attorney."

 In testifying, Mr. Newman frequently referred to himself as attorney for the A. C. Fry Company, for which corporation Mr. Hulback had been attorney for more than forty years. In one instance, presumably out of deference to Mr. Hulback, he referred to himself as "sub-attorney" for the company. These are merely his conclusions. No evidence even tending to support such a conclusion is found in the record. There is no evidence that the corporation ever asked him to do anything, or consented to his doing anything, or ever agreed to pay him anything, or was ever asked to do so. It was his theory, as shown by his own evidence, that he was performing a service for three individuals, his client Earl Fry, Mr. Hulback, an executor, and Raymond Fry. We quote certain portions of his testimony:

"Q. Now, then, after taking the offer from Henry Broderick Company, did you at that time, had you been authorized by Mr. Hulback, by Mr. Raymond Fry to represent the corporation? A. Frankly, I would say I—whatever we discussed, the corporation discussed, three of them, two of them and Earl Fry as stockholder of the officers, the board of directors. Q. Did you know who the board of directors were? A. I did not. Q. Did you ever have talk with the board of trustees? A. No, sir, not as a board of trustees. Q. Did you ever have any conversation with the stockholders as in a meeting about an authority? A. No. I know what your question implies, Mr. Miller, but frankly, I talked with representatives. . . . Q. All right. Now, then, you speak of, there would be no commission paid. As a matter of fact you expected to be paid $750, did you not? A. Not as a commission. Q. Doesn't make any difference. You were going to be paid out of the funds of this $35,000? A. No, it was

to be paid $250 Hulback, $250 by Ray Fry and Earl A. Fry. Q. The A. C. Fry Corporation owned the building, didn't they? A. Well, I say the stockholders own it. Q. But the suit here is against— A. (Interposing) They were each stockholders, were each agreeable. I quote again, Mr. Hulback said, 'That is very reasonable.' Mr. Miller: Mr. Newman, will you just please answer the question? A. Yes. Q. You fully expected to get $750 and that $750 would have to come out of this $35,000 regardless of who received it? A. No, we were to be a fee of, attorneys' fee of $750 that was paid. Q. How was it to be paid? A. $250 by the A. C. Fry and Anna Fry estate, as we understood it. Any rate, and Mr. Ray Fry was to pay $250 and Mr. Earl Fry was to pay $250. Q. Now, then, when was that agreement entered into? A. Before we signed the letter of December 4th. Q. What have you got, anything in writing, or anything? A. No, I never. I say never, I think twice in my practice of nearly twenty years, have I had a client, had to write something about our fees; won't have any formal contract in our office like some offices do about fees. Mr. Miller: Just a moment, if the Court please, that is not responsive to the question. Q. Mr. Newman, assuming now that this $750 would have been an attorney fee, where did you expect Mr. Hulback to get $250 to pay you when he only owned one share of stock, individually? A. I am not assuming, as a matter of fact, Mr. Miller, it was an attorney's fee agreed upon between attorney and client, so Mr. Hulback was not going to get it out of one share of stock; he represented as executor one-third of the, approximately one share, more than one-third of the capital stock of this corporation in an estate. Q. As a matter of fact— A. (Interposing) So he expected to get one-third of that or $250 from the estate, not from the corporation."

Subsequently, Mr. Newman further testified as follows:

"Q. Now, getting back to this commission. This $750 would necessarily have to be added to the expense in this transaction, if it had been consummated? A. No, because that was coming out of the individuals, coming from the individuals, not from the transaction or from the company."

Neither do we consider that Mr. Newman was ever employed as an attorney by executor Hulback or by Raymond Fry. As we have seen, he had a client who owned substantially a third of the A. C. Fry Company stock and

who wanted its sole asset sold and the corporation wound up. Through Raymond Fry's suggestion, at the meeting in the Broderick office, he came into contact with a potential buyer. He quite properly seized upon the opportunity to do his client a service by getting a good bid for the property. Plainly, that would appear to be a service to Raymond Fry and to Mr. Hulback also, or, more accurately speaking, to the persons for whom Mr. Hulback was a fiduciary. There was nothing reprehensible in his expecting them to compensate him also, and, according to his evidence, they both agreed to do so if the price named was received on the completion of the transaction. They denied that they agreed to pay him, but, assuming that they did, we do not see that the relation of attorney and client was thereby created. However, we will not press the point, since, as we will hereinafter point out, it is settled law in this state that an attorney selling real estate for a client has no greater power or authority to bind his principal than a real estate broker would have.

On December 7, 1944, three days after executing the alleged contract hereinbefore quoted, Mr. Newman escrowed respondent's check for five thousand dollars with a Seattle bank, with instructions to hold it

" . . . to the joint order of Northwest Poultry and Dairy Products Company of Oregon by F. E. Pauli and Hill, Newman, and Cook, Attorneys for A. C. Fry Company, Mr. Oliver Hulba*ch*, Executor of the Estate of Annie R. Fry and Mr. A. C. Fry, Mr. Earl Fry, and Mr. Raymond Fry, by L. L. Newman."

For what purpose it was to be held is not shown in the escrow agreement. It was executed on the part of the respondent by Pauli and by L. L. Newman for Hill, Newman & Cook, and duly accepted by an officer of the bank. Some few days later, Mr. Newman informed Hulback that he had sold the property, and some money had been deposited in the bank, but there is no evidence that he furnished Hulback or any other of his alleged clients a copy of the escrow agreement.

In the meantime, on December 5th, one day after the execution of the alleged contract (exhibit No. 2) and two days before the deposit of the escrow, and several days before Mr. Newman informed his alleged clients that he had entered into a contract on their behalf, the proprietors of the Olympic Sausage Company went to the Owen-Farlin Company, the real estate firm which had for years been the rental and real estate agent for the corporation, and made an offer for the property in dispute; price to be $41,000; cash, $17,000 (subsequently raised to $21,000), and $350 per month, with interest at five per cent. Fifteen hundred dollars earnest money was paid on that date, all as shown by a standard earnest money receipt, which is in evidence as exhibit "E."

Mr. Newman testified that, about December 11th or 12th; either Raymond Fry or Mr. Hulback told him of the Olympic Sausage Company $41,000 offer, and he replied: "You can't do it because the building is sold." On December 15th, Mr. Newman called on Mr. Hulback, accompanied by Mr. Hill, and they attempted to get him to go through with the Northwest Poultry & Dairy Products Company deal. Mr. Hill testified that, at the conclusion of the conference, Mr. Hulback said: "If that is what Earl wants, I don't care, or I won't stand in the way." It seems, however, that Mr. Hulback insisted that the deal would have to be approved by the corporation.

A special meeting of the stockholders was called for December 25th, for the stated purpose of considering the two offers. Mr. Newman appeared and stoutly insisted that there was but one offer, since the property had already been sold. He had a copy of the alleged contract of sale with him and read from it, but refused to leave it. He also had a general power of attorney from his client, Earl Fry, but no proxy to vote his stock, and the meeting adjourned until December 26th to give him time to procure one. On the twenty-sixth, Mr. Newman presented a resolution directing the stockholders of the company to execute a deed to the respondent in this action. He declined to file the instruments upon which he relied. A motion was made to accept

the offer of the Olympic Sausage Company, which was carried, Mr. Newman voting the 1,666 Earl Fry shares in the negative. Pursuant to the vote of the holders of the 3,334 remaining shares, the officers were directed to effectuate the proposed sale negotiated by Owen-Farlin Company. On the next day, Mr. Raymond Fry, as president of the Fry company, indorsed its acceptance of the Olympic Sausage Company bid on the earnest money receipt.

Just when Mr. Newman severed the alleged relation of attorney and client between his firm and the three principal stockholders, the record does not show. On January 4, 1945, eight days after the stockholders' meeting, an officer of the respondent verified the complaint in this action, drawn by Newman & Cook as attorneys for the plaintiff, Northwest Poultry & Dairy Products Company, a corporation, naming the Fry company, Raymond Fry, his wife, Mr. Hulback, executor of the Fry estates, and Earl Fry as defendants. Certainly, at that time, he could no longer be considered the attorney for any of those parties. At the beginning of the trial, however, Mr. Earl Fry was, by a formal written order, shifted from defendant to coplaintiff. Although the record does not so show, he must have been restored to his original status at some later stage of the trial, since the plaintiff took judgment against him as a defendant.

A few days after the trial, the trial court rendered a memorandum opinion in favor of the plaintiff, and another, somewhat later, in denying the defendants' motion for a new trial. A decree was ultimately entered, providing that all title and interest in the real estate in question

"... be and it is hereby ordered vested in the plaintiff upon delivery by plaintiff to defendant of the total agreed purchase price of said above described property to-wit; the total sum of $35,000.00."

Plaintiff was further allowed its costs.

From that decree, the defendants appealed, contending it to be erroneous for a number of reasons, not all of which will be discussed. As we understand the briefs, the appel-

lants' contentions are: (1) that an agent claiming to have had parol authority to bind his principal to an enforcible contract to sell real estate, must establish his claim by clear and convincing proof; (2) that, when acting on oral authority to sell land, a real estate agent or broker has no power to enter into a contract to convey which will bind his principal; (3) that, under the facts of this case, the court erred in disregarding the corporate entity by "piercing" the corporate veil; and (4) that, since the building was the only asset of the corporation, the provisions of Rem. Rev. Stat. (Sup.), § 3803-36 [P.P.C. § 443-1], could not lawfully be ignored.

■ The first contention is amply sustained by *Degginger v. Martin,* 48 Wash. 1, 92 Pac. 674, and numerous other decisions of this court. For decisions of other courts, see note, 48 A. L. R. 636. It is said in 37 C. J. S. 709, § 213:

"In jurisdictions where the authority of an agent to execute a contract for the sale of real estate need not be in writing, verbal authority, to be sufficient, must be clear, decisive, and unequivocal."

It does not appear clear to us from the evidence that the minds of the parties met in any such agreement as Mr. Newman contends. Mr. Hulback was a lawyer of standing and of long experience. He testified that it never occurred to him that an executed sale could, or would, be consummated except through corporate action. There is reason to believe that Raymond Fry, though not an attorney, was quite likely of the same opinion. He seems to have had some knowledge at least concerning the necessity of formal corporate action in important matters. Quite adventitiously and purely by accident, Mr. Evans, of the Broderick staff, while on the stand as a witness for the plaintiff, testified, in answer to a question put by Mr. Newman:

"I asked Mr. Raymond Fry if it would be possible for us to get an exclusive on the building, either for sale or for lease, and he replied that it would take a stockholders' meeting in order to get this."

Is it shown by clear, decisive, and unequivocal evidence that, in the separate telephone conversations with Mr. Newman, Hulback and Raymond Fry intended to give Mr.

Newman the right to dispose of the building as freely as if it were his own individual property? There is no evidence that he consulted Hulback or either of the Frys when Mr. Pauli made the second offer. As has been heretofore shown by quotation from Pauli's testimony, there were some things in the first offer he did not like. So, a second offer was prepared. This was converted into the alleged contract (exhibit No. 2) through acceptance by Hill, Newman & Cook on behalf of the corporation and all of the individuals whom we have so repeatedly named in this opinion. We are strongly inclined to think that the question last put would have to be answered in the negative, but, since an attempt to so show would involve the quotation and analysis of a great deal of sharply conflicting evidence, we will pass on to the appellants' second contention; for we think that it is, in and of itself, decisive in this case.

In *Carstens v. McReavy,* reported in the very first volume of our state reports at page 359, 25 Pac. 471, a rule of law was adopted from which we have never departed. The rule, as stated in the case headnote, is as follows:

"Under a verbal authority to sell land, a real estate agent or broker has no power to enter into a contract of conveyance binding upon his principal."

The *McReavy* case has been followed in many of our subsequent decisions, and has been cited, with approval, as late as 1945, *Best v. Kelley,* 22 Wn. (2d) 257, 155 P. (2d) 794, 156 A. L. R. 1387. Since these decisions may be easily found by use of Shepard's Washington Citations, they will not be cited here. The opinion in the *McReavy* case states the question then before the court for decision in the following words:

"It, therefore, only remains to determine whether the ordinary real estate agent or broker, authorized to *sell* land, is thereby empowered to enter into a contract binding upon his principal in an action for specific performance."

The word "sell" was italicized by the court, and it so appears in other parts of the opinion. For our present purpose, although there is a sharp conflict in the evidence,

we will accept Mr. Newman's own version of the matter. He testified that he was authorized by Mr. Hulback, over the telephone, in these words, "Go ahead, make the deal," and that he then called Raymond Fry by telephone at his office and told him of the offer, and Fry said: "That is fine. You go ahead and make the deal." These words are no stronger than, indeed scarcely as strong as, the words involved in the *McReavy* case. There, the alleged authority was to "sell." "Sell" has the flavor of passing title, making "a deal," of agreeing upon a price.

Early in the opinion, we stated that we did not consider that Mr. Newman was at any time an attorney for Mr. Hulback or Raymond Fry, but that whether he was or not was not of special importance. In *Scully v. Book,* 3 Wash. 182, 28 Pac. 556, Scully secured a decree in the trial court against Book, directing him specifically to perform a land contract, ostensibly entered into by him through the agency of one Glidden. The defendant Book appealed, relying upon the rule of the *McReavy* case. The plaintiff, however, contended that it was not applicable, on the ground that Glidden was not a mere real estate agent, but was Book's attorney. The court ruled as follows:

"Whatever Book may have said and done conferred no greater authority upon Glidden situated as he was than it would have done had he been in the land brokerage business. This case is governed by the authority of *Carstens v. McReavy.*"

The rule applied in these cases is by no means peculiar to this jurisdiction. It is well-nigh universal. Due to the fact that this opinion has already attained too great a length, our citations in support of this statement will be confined to a note in 8 Ann. Cas. 849, another in Ann. Cas. 1917A, 523, and one or two illustrative cases. See, for example, *Brown v. Hogan,* 138 Md. 257, 113 Atl. 756, and *Record v. Littlefield,* 218 Mass. 483, 106 N. E. 142, from which case we quote as follows:

"The conversation held over the telephone between Anglin and the defendant shows that Anglin informed him that a purchaser on the terms stipulated had been found.

But the direction then given, 'It is all right; go ahead,' did not include authority to make a contract in writing in accordance with the proposed terms of sale which would bind the defendant. *Lyon v. Pollock, 99 U. S. 668.*"

In its second memorandum opinion in this case, the trial court announced that it felt compelled to hold for the plaintiff on account of a previous decision of this court. In speaking of the instant case, the court said:

"I cannot distinguish it from the case of *Roberts vs. Hilton Land Co.,* 45 Wash. 464. . . . I appreciate the logic of Judge Fullerton's dissenting opinion, and were the matter before me one of first impression it might cause me considerable concern, but as I am bound by the decision of the majority, which has never been reversed, I am, of course, precluded. It may be that the Supreme Court will want to reexamine this question, but as long as the *Roberts* case is unchanged by that court, any further consideration by me is foreclosed."

To the best of our belief, the *Roberts* case has not been overruled, and, as we interpret it, it is one of the strongest cases in appellants' favor that we have found in the briefs. The elementary facts are stated in the first paragraph of the opinion as follows:

"DUNBAR, J.—The Haynes-Cowen Company were engaged in the real estate business in the city of Seattle. One John Hilton, a resident of the city of Everett, authorized them to sell the south fifty-four feet of lot 4 and the north six feet of lot 5 in block 289 of Seattle tide lands. Soon thereafter the brokers found a purchaser in the person of plaintiff, accepted from the plaintiff a deposit of $500, and gave him a receipt signed by them. They informed Mr. Hilton of the transaction which, he replied, was satisfactory, and received $250 out of the $500 which had been paid by the Haynes-Cowen Company. Refusing to carry out the terms of the contract, this action was brought by the purchaser to enforce specific performance."

It is further shown in the next to the last paragraph of the majority opinion that, in addition to saying that the sale was satisfactory, after having been informed of it and receiving and accepting two hundred fifty dollars of the purchase price, Hilton had an abstract of the property

prepared and took it to the office of his alleged agent, though, on account of some difficulty which arose, he did not leave it there. It is further shown on the second page of the opinion that the sale was made on the exact terms contained in Hilton's instruction to the agent. The question presented for decision, and decided, is stated on page 469 as follows:

"The only serious question in this case is that of whether the Haynes-Cowen Company had authority to enter into a contract of sale for the land which had been placed in their hands for sale by the appellant, the contention of the appellant being that the authority only extended to finding a purchaser, and that the contract of sale would have to be made between the purchaser and the owner. And it is contended that this was squarely decided by this court in the case of *Carstens v. McReavy*, 1 Wash. 359, 25 Pac. 471, and such seems to have been the effect of that decision. *We are not prepared to overrule the doctrine there announced, nor do we wish to extend it. In that case [Carstens v. McReavy] there was no element of estoppel by reason of the contract having been ratified in any manner whatever*; it appearing that the contract was made for the defendant's property without his knowledge and in his absence from the state, *and that when it came to his knowledge he refused to recognize the contract and denied the authority of the agents to sell.*" (Italics ours.)

And in this case there is "no element of estoppel by reason of the contract having been ratified in any manner whatever" by Mr. Hulback and Raymond Fry. While it must be conceded that Earl Fry ratified it when he joined the respondent in suing the Fry company and his fellow stockholders in this action, he owned only a third of the stock, accurately speaking, a little less than a third, and he could not effectually ratify the contract, acting alone. Mr. Hulback and Raymond Fry had in fact very little chance to ratify the contract. As we have already seen, they were not furnished with a copy or with a copy of the escrow agreement. It is true that Mr. Hulback was informed that some money had been put in a bank, but neither he nor Raymond Fry received any of it or tried to obtain it, and could not have done so had they desired to,

since it was held "to the joint order" of respondent and Hill, Newman & Cook.

■ The case of *Roberts v. Hilton Land Co.*, 45 Wash. 464, 88 Pac. 946, strongly supports the appellants' position. It clearly affirms the *McReavy* case, but reaches a different result because the facts warranted the application of the following simple and familiar principle of agency:

"Ratification may briefly be defined as the subsequent adoption and affirmance by one person of an act which another, *without authority*, has previously assumed to do for him while purporting to act as his agent." 1 Mechem on Agency (2d ed.) 260, § 347. (Italics ours.)

It is unnecessary to pursue this matter further. If the contract bound the three stockholders, the next inquiry would be: Can their acts be considered the act of the corporation under the "piercing the veil" theory? But since we hold that the stockholders were not bound, that question becomes wholly academic, and the question raised concerning noncompliance with Rem. Rev. Stat. (Sup.), § 3803-36, becomes equally so.

■ Some suggestion was made in oral argument to the effect that the equities are in favor of the respondent. This, we think, is without merit. As we have hereinabove indicated, Mr. Pauli, agent for the respondent, made no inquiry whatever as to Mr. Newman's authority. This was the initial mistake and originating cause of this lawsuit. We again quote from 1 Mechem on Agency (2d ed.) 527, § 743:

"An assumption of authority to act as agent for another of itself challenges inquiry. Like a railroad crossing, it should be in itself a sign of danger and suggest the duty to 'stop, look and listen.' It is therefore declared to be a fundamental rule, never to be lost sight of and not easily to be overestimated, that persons dealing with an assumed agent, whether the assumed agency be a general or special one, are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature

and extent of the authority, and in case either is controverted, the burden of proof is upon them to establish it."

The author devotes the immediately succeeding sections to demonstrating that this is not an unfair rule.

The decree appealed from will be reversed, and the action dismissed.

ALL CONCUR.

