**COLVILLE CONFEDERATED TRIBES, Plaintiff,**

v.

**Francis SOMDAY, II, and Roberta L. Somday, and the marital community composed thereof, Defendants.**

No. CS–98–350–AAM.

United States District Court, E.D. Washington.

April 5, 2000.

Philip J. Carstens, Jr., Michael G. Black, Lukins & Annis, Spokane, WA, for plaintiff, Colville Confederated Tribes.

James S. Berg, Robert Marble, Halverson & Applegate, Yakima, WA, for defendants Somday.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT INTER ALIA

McDONALD, Senior District Judge.

**BEFORE THE COURT** are cross-motions for summary judgment filed by plaintiff and the defendants (Ct.Rec. 32 and 44).

## I. BACKGROUND

This is a declaratory judgment action pursuant to 28 U.S.C. § 2201.[1] The plaintiff, Colville Confederated Tribes, hereinafter "CCT," asks the court to declare: 1) that the CCT Employees' Retirement Plan ("the Plan") constitutes a "government plan" within the meaning of 29 U.S.C. § 1003(b), and is exempt from the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"); 2) that the 1982 amendment to the Plan is effective and enforceable pursuant to 29 U.S.C. § 1102(b)(3) of ERISA; and 3) that as a result of the 1982 amendment to the Plan, defendant Francis Somday's benefits under the Plan should be calculated based upon the formula of one percent (1%) of his average monthly compensation.[2]

---

1. 28 U.S.C. § 2201 provides:

   In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

2. The Declaratory Judgment Act is not a grant of jurisdiction to federal courts. Rather, it makes available an additional remedy in cases in which the courts have jurisdiction by virtue of diversity and the requisite amount in con-

Plaintiff contends there is no issue of material fact that the 1982 amendment to the Plan is enforceable.

Defendants, Francis W. Somday, II, and Roberta L. Somday, have filed a cross-motion for summary judgment seeking dismissal of the plaintiff's complaint on the basis that declaratory relief is inappropriate because the issues raised in plaintiff's complaint are not ripe for review, the plaintiff has not exhausted administrative remedies, and equitable considerations require dismissal.

## II. FACTS[3]

Plaintiff CCT is a tribal government duly recognized by the United States Secretary of Interior, and at all time relevant hereto has operated within the boundaries of the Colville Reservation.

Defendant Francis W. Somday, II, (hereinafter "Somday"), was the Executive Director of CCT from 1978 to 1986. Somday's duties involved supervision of all departments, divisions and programs of the Tribal Government structure. He was supervised by the CCT Business Council and its officers.

Somday worked with Stephen Berde to analyze and implement a retirement plan for the employees of CCT. On March 16, 1981, the CCT Business Council (also referred to herein as "the Colville Business Council," the "Business Council," or simply

"the council") approved a contract with Stephen Berde Associates ("SBA").

On May 18, 1981, the Business Council approved, by Resolution 1981–423, an "attached" Employees' Retirement Plan, and authorized the Chairman of the Business Council to sign the Plan Document. The Plan Document attached to the resolution had the word "DRAFT" stamped on every page. (Ex. A to Declaration of Rodney Cawston). This Plan Document, (hereinafter referred to as the "DRAFT" Plan Document), was never signed by anyone.

Article 5.02 of the "DRAFT" Plan Document stated that "[a] Participant's normal retirement pension shall equal 1.5% of the Participant's average monthly compensation multiplied by his Years of Service with the Employer." (Emphasis added).

Article 1.03 of the "DRAFT" Plan Document identified Seattle–First National Bank as the Trustee of the Plan.

Article 16.01 of the "DRAFT" Plan Document provided that the Trustee accept the terms of the Trust created under the terms of the Plan.

Article 16.11 of the "DRAFT" Plan Document provided that in the event of resignation or removal of the Trustee, the Employer (CCT) was to appoint a Successor Trustee if it intended to continue the Plan.

Article 15.01 of the "DRAFT" Plan Document provided that the Employer (CCT)

---

troversy, or because of a federal question. 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, Civil 3d, §§ 2766, 2767.

Here, subject matter jurisdiction is premised on the existence of a federal question, 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1362, district courts have original jurisdiction of all civil actions, brought by an Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States. The federal question arises from ERISA and whether that federal statute applies to the CCT Plan. Although plaintiff claims the plan is exempt from ERISA and the amendment to the plan is therefore valid

without approval from the U.S. Secretary of Labor, if plaintiff chose not to bring this suit for declaratory relief at this time, the defendants might eventually bring suit in federal court under ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking to recover benefits under the terms of the Plan and claiming the amendment to the Plan is not valid because of the lack of approval from the Secretary of Labor. Rather than wait for such a lawsuit from the defendants, the plaintiff asks the court to decide the dispute now so as to avoid breaching the defendants' rights. See *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir.1997).

**3.** The following are uncontroverted facts gleaned from the statements of material fact filed by plaintiff and defendants.

appoint an Advisory Committee to administer the Plan. Article 15.02 provided that each member of the Advisory Committee serve until his successor was appointed.

Article 15.04 of the "DRAFT" Plan Document set forth the powers of the Advisory Committee including: (a) selection of a Secretary; (b) determining eligibility of employees to participate in the Plan and the value of participants' benefits; (c) enforcement of terms of the Plan; and (d) directing the Trustee regarding distribution of the Trust.

Article 15.05 of the "DRAFT" Plan Document provided that the Advisory Committee review all pertinent employee information and Plan data in order to establish the funding policy of the Plan and determine the appropriate method of carrying out the Plan's objectives. '

Article 15.07 of the "DRAFT" Plan Document provided that the Advisory Committee could authorize one of its members, or the Secretary, to sign any documents on its behalf, provided this authority was evidenced by an instrument signed by all members and filed with the Trustee.

Article 17.01 of the "DRAFT" Plan Document provided that "[a]ny action required of the Employer [CCT] shall be by resolution of the Colville Business Council, or by a person authorized by resolution of the Colville Business Council."

Article 17.07 of the "DRAFT" Plan Document provided that all questions arising with respect to the Plan were to be determined by application of the laws of the State of Washington "except to the extent Washington law is superseded by Federal Statute."

Article 18.02 of the "DRAFT" Plan Document provided the Employer (CCT) with the right to amend the plan at any time and in any manner, so long as the amendment was in writing.

A Summary Plan Description dated May 1981 was included along with the "DRAFT" Plan Document. The word "DRAFT" was printed on each page of the Summary Plan Description. (Ex. A to Declaration of Rodney Cawston).

The "DRAFT" Summary Plan Description identified Seattle–First National Bank as Trustee of the Plan. (Paragraph 5 of Summary Plan Description).

The "DRAFT" Summary Plan Description identified defendant Francis W. Somday, II, as the contact person for information about the Plan, the person designated as agent for service of legal process, and the Secretary of the Advisory Committee. (Paragraphs 1 and 4).

The "DRAFT" Summary Plan Description stated the Advisory Committee would calculate a normal retirement pension according to the following formula: 1.5% of Average Monthly Compensation times Years of Service with the Tribe. (Paragraph 7).

CCT requested that Stephen Berde Associates ("SBA") design a plan that would be funded by CCT in the amount of approximately $250,000 a year. The Colville Business Council approved a defined plan to be funded by CCT in the amount of approximately $250,000 a year.

Somday informed SBA that Seattle–First National Bank would not be the Trustee, but that there would be several individual trustees, including Somday. Seattle–First National Bank never served as Trustee.

On June 24, 1981, Stephen Berde sent a letter to Somday which enclosed a revised Defined Benefit Pension Plan and Trust Agreement (hereinafter the "Revised Plan"), a proposed business council resolution, and a form for appointment of an advisory committee. Berde requested the documents be signed before June 30, 1981.

The Revised Plan (Ex. A to Declaration of Gayle De La Cruz) is the document located in the records of the CCT retirement plan, as opposed to the "DRAFT" Plan previously authorized by Council Resolution 1981–423 on May 18, 1981.

Article 1.03 of the Revised Plan named individuals as Trustees, instead of Seattle–First National Bank. The individuals named as Trustees included: Francis W. Somday, II, Michael N. Somday, Philip Grunlose, Eddie Palmanteer, Jr., and Eugene Nugent.

Other than the change in named Trustees, the "DRAFT" Plan and the Revised Plan were similar, including: 1) Article 5.02 which states that "[a] Participant's normal retirement pension plan shall equal 1.5% of the Participant's average monthly compensation multiplied by his Years of Service with the Employer;" 2) Article 17.01 which states "[a]ny action required of the Employer shall be by resolution of the Colville Business Council, or by a person authorized by resolution of the Colville Business Council;" and 3) Article 18.02 which states the employer (CCT) has the right to amend the plan at any time and in any manner, provided the amendment is in writing.

The Revised Plan, the proposed business council resolution and the form for appointment of advisory committee were signed and returned to Stephen Berde Associates. The Revised Plan was executed on June 29, 1981 by the "Employer" (CCT) under the signature of Al Aubertin, Chairman of the Colville Business Council.[4] The Revised Plan was also signed by the individual Trustees. The Appointment of Advisory Committee Form, signed by each of the individual trustees, bears a date of June 29, 1981. (Ex. B to Declaration of Gayle De La Cruz). However, the returned business council resolution, signed by Al Aubertin as chairman of the council, was dated May 18, 1981. (Ex. C to Declaration of Gayle De La Cruz).

According to official archival records of the Colville Confederated Tribes, there is no record of any meetings of the Business Council between June 24, 1981 and June 30, 1981.

The proposed business council resolution was designated as "1981–423." It was returned to Stephen Berde Associates from CCT with that designation. This resolution, hereinafter referred to as "Surrogate Resolution 1981–423," has been maintained only in the pension records of CCT. (Ex. C to Declaration of Gayle De La Cruz).

Surrogate Resolution 1981–423 is not the same as the original resolution 1981–423. Surrogate Resolution 1981–423 includes a directive that the Plan commence on July 1, 1980, that CCT contribute the necessary amount to the Trust for the fiscal year ending June 30, 1981, and that an Advisory Committee be appointed with Somday as the Secretary of the Advisory Committee. (Ex. C to Declaration of Gayle De La Cruz). Somday remained Secretary of the Advisory Committee until at least March 1986 and perhaps as late as May 1987.

The "Appointment of the Advisory Committee" form, dated June 29, 1981, states that "[a]ll parties dealing with this Plan and Trust are hereby authorized to act upon the signature of FRANCIS W. SOMDAY, II, alone in matters pertaining to the aforesaid Plan and Trust." (Ex. B to Declaration of Gayle De La Cruz).

Somday, in his capacity as Executive Director of the CCT, had a duty to administer the Plan.

The Pension Benefit Guaranty Corporation (PBGC), an agency of the United States Government, determined that the Plan was exempt from the Employee Retirement Income Security Act (ERISA) as a governmental plan under Section 4021(b)(2). Stephen Berde Associates understood that an exempt plan was not subject to statutory minimum funding requirements.

During 1981 and early 1982, SBA gathered data in order to assist with calculation of the CCT contribution to the Plan, and Somday was involved in providing data to SBA.

On January 14, 1982, CCT revoked the appointment of Francis W. Somday, II, Michael N. Somday, Philip Grunlose, Ed-

4. Mr. Aubertin is now deceased. (Declaration of Lou Stone).

die Palmanteer, Jr., and Terrence L. Finley as Trustees for the Plan. Seattle Trust and Savings Bank was appointed Successor Trustee.[5] (Ex. A to Response Declaration of Gayle De La Cruz). This was effectuated by Council Resolution 1982–49.

On January 14, 1982, the Business Council approved, by Resolution 1982–51, a plan to implement a 4–day work week because of severe economic conditions of the timber market and modification of the CCT budget to reflect a reduction in revenue.

By early 1982, amendments to the Plan were being considered. More accurate employee data was compiled by SBA after adoption of the Plan, and it became apparent that funding the one and one-half percent (1.5%) level would exceed the budget authorized by the Council. SBA was asked by CCT to amend the Plan in order to have it come closer to budget authorization.

CCT decided to amend the Plan prior to the end of June 1982. On June 29, 1982, in Resolution 1982–391, the Colville Business Council adopted a three month extended budget for Fiscal Year 1982, and also recognized that the CCT fiscal year had changed from July 1–June 30 to October 1–September 30.

CCT contributed $222,575.63 for the first year of the Plan and this contribution was sent to Seattle Trust and Savings Bank by check dated June 29, 1982. Seattle Trust and Savings Bank received the payment on July 5, 1982 and accepted appointment as Trustee of the Plan on July 8, 1982.

Christine Carbery of SBA drafted "Supplement Number One To the Colville Confederated Tribes Employees' Retirement Plan Summary Plan Description." (Ex. D to Carbery Declaration). At the request of CCT, she attended meetings of employees of CCT at several locations on the reservation in July 1982 for the purpose of explaining the Plan, and she distributed Supplement Number One to the employees at these meetings.

Supplement Number One explained changes to the Summary Plan Description of June 1981. Among the changes set forth in Supplement Number One was the formula for determining retirement benefits. Supplement Number One explained the new formula would be "1% of your Average Monthly Compensation times your Years of Service with the Tribe since July 1970." (Emphasis added).

Supplement Number One has been maintained in the records of the Plan since 1982. Supplement Number One was available to employees.

Ms. Carbery also drafted "Amendment One To The Colville Confederated Tribes Employees' Retirement Plan" later in 1982. (Ex. E to Carbery Declaration). Paragraph 7 of the Amendment states:

Section 5.02 *AMOUNT OF NORMAL RETIREMENT PENSION*, page 10, is amended by changing the formula of '1.5% of the Participant's average monthly compensation' to '1% of the Participant's average monthly compensation.' The Section is further amended by deleting the sentence beginning 'Year of Service shall commence, etc.,' and by replacing with 'Years of Service prior to July 1, 1970 shall be disregarded.'

(Emphasis added). This amendment was to be effective as of July 1, 1980.

Other amendments included changing the maximum date at age of hire (under 60), deleting compliance with statutory minimum funding requirements, and specifying dates for the Plan Year in place of referring to the Colville Confederated Tribes' fiscal year.

Amendment One was signed by Al Aubertin on behalf of the "Employer," Colville Confederated Tribes. It was also signed by a representative of Seattle Trust and Savings Bank. The Amendment bears a date of December 21, 1982. According

---

5. Seattle Trust and Savings Bank is to be distinguished from Seattle–First National Bank which was the designated trustee in the "DRAFT" Plan.

to the official records of CCT, a meeting of the Colville Business Council occurred on December 21, 1982.

On January 12, 1983, Somday mailed a letter to Ms. Carbery of SBA, enclosing "Amendment One to the Colville Confederated Tribes Employees' Retirement Plan" as signed by Al Aubertin. Also enclosed was the "Appointment of Advisory Committee" form signed by Somday and others.

Amendment One is the only amendment to the Plan, and it has been maintained in the records of the Plan.

On February 23, 1988, Mark G. Powers of National Associates, which consulted with CCT regarding its Plan, mailed a letter to Somday which calculated benefits for Somday as a participant of the Plan. The letter was mailed in response to a request from Somday and the calculation is based on the 1% pay formula. A copy of the letter from Powers to Somday was received by CCT.

The earliest Somday will be entitled to benefits under the Plan is May 22, 2007 when he reaches age 55. As yet, Somday has not made a formal request for benefits under the Plan.

CCT has funded the Plan according to a formula providing benefits based upon 1% of compensation multiplied times years of employee service. Somday believes his benefits should be calculated using a formula based on 1.5% of his average monthly compensation and he has informed CCT of his belief.

On advice of legal counsel, Somday notified the Pension and Welfare Benefits Administration (PWBA) of the Department of Labor (DOL) of his concern that CCT was improperly administering the Plan. DOL is currently investigating the Plan, but has not initiated any enforcement action.

The Plan is in the process of being terminated and participant benefits will distributed after a Closing Agreement Procedure with the Internal Revenue Service is completed.

## III. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Under Fed. R.Civ.P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner,* 780 F.2d 727 (9th Cir.1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex,* 477 at 322–23, 106 S.Ct. 2548.

## IV. DISCUSSION

The dispute here is whether Mr. Somday is entitled to retirement benefits based on 1.5% of his average monthly compensation times years of service, or 1% of his average monthly compensation times years of service.

Somday contends 1.5% is the correct figure because: 1) the CCT Plan is subject to ERISA and therefore, any amendment to the Plan retrospectively decreasing the amount of benefits would have required approval of the Secretary of Labor and said approval was not obtained; 2) even if the Plan is not subject to ERISA, any amendment to the Plan decreasing the amount of benefits is invalid because it was never properly adopted pursuant to formal council resolution as required by the Plan.

As a preliminary matter, however, Somday contends these issues are not ripe for adjudication and that CCT should exhaust administrative remedies before seeking a judicial determination of the applicable benefit formula.

### A. Ripeness/Exhaustion

The Declaratory Judgment Act applies only in "cases of actual controversy," 28 U.S.C. § 2201. This conforms with Article III, Section 1, of the U.S. Constitution which limits the judicial power of federal courts to "cases" and "controversies." A dispute must be "immediate, concrete, real, substantial." *Stewart v. M.M. & P. Pension,* 608 F.2d 776, 782 (9th Cir.1979). The question in each case is whether the facts alleged, under all the circumstances, show there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

Defendants contend the issues raised in this case are not ripe for declaratory relief because there is no "immediate or imminent threat" to plaintiff. According to defendants, any potential immediate or imminent threat to CCT must derive from CCT's potential liability to Somday under the Plan. Because the earliest Somday could become eligible for Plan benefits is when he turns age 55 on May 22, 2007, defendants assert "[i]t is purely speculative whether the parties' current disagreement will eventually materialize into an immediate and imminent threat to CCT seven years from now."

Defendants argue that plaintiff should exhaust administrative remedies before this court considers whether declaratory relief is proper. Defendants cite an 11th Circuit case, *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.,* 848 F.2d 1164 (11th Cir.1988), involving a dispute regarding the proper formula for calculating retirement benefits. The court there noted it owed great deference to the interpretations and regulations of the Pension Benefit Guaranty Corporation ("PBGC"), the Internal Revenue Service, and the Department of Labor which are the administrative agencies responsible for enforcing and interpreting ERISA. 848 F.2d at 1167. The court quoted *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980), wherein the Supreme Court stated: "[A] court that tries to chart a true course to the Act's purpose embarks on a voyage without a compass when it disregards the agency's views." *Id.*

According to defendants, the current investigation of the CCT plan by the Pension and Welfare Benefits Administration (PWBA) of the Department of Labor (DOL) "greatly reduces the probability that the issues disputed between the parties will exist seven years from now when Somday is eligible for Plan benefits." Defendants refer to a letter Somday received in July 1997 from counsel for CCT. (Ex. A to Defendants' Memorandum of Points and Authorities). In that letter, counsel for CCT stated:

> As you are well aware, Mike Hughes of the Pension and Welfare Benefits Administration of the Department of Labor is currently conducting an examination

of the Pension Plan. I expect that one of the areas he will be investigating is the effectiveness of the 1982 Plan Amendment. Until Mr. Hughes' investigation is completed, the Tribes (sic) has no intention of changing its position on the amount that you are entitled under the Pension Plan.

Defendants contend a determination by DOL that the 1982 amendment is valid or invalid "will likely resolve the potential dispute between the parties." According to defendants, by allowing the DOL to determine whether ERISA applies to the Plan and whether the Plan was properly amended, this court gains the institutional expertise of the administrative agency without forcing CCT to incur any immediate harm. Defendants note that CCT would not be precluded from appealing the DOL's decision or bringing this declaratory action seven years from now if DOL does not resolve the issues.

Defendants contend an advantage of a DOL decision regarding the validity of the 1982 Plan amendment is that it "will likely apply to all Plan participants, not just Somday," and therefore "facilitate a consistent and equitable treatment among beneficiaries of the Plan." According to defendants, because CCT has not named all of the Plan participants as defendants in this action, a declaratory judgment in this case may result in Mr. Somday being treated as a "class of one."

29 U.S.C. § 1132(a)(1)(B) of ERISA authorizes a plan participant or beneficiary to commence a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, **or to clarify his rights to future benefits under the terms of the plan.**" (Emphasis added). 29 U.S.C. § 1132(a)(3) authorizes a plan participant, beneficiary, or fiduciary to bring a civil action to enjoin any act or practice which violates any provision of this subchapter (Subchapter I of ERISA) or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provision of this subchapter or the terms of the plan.

■ Exhaustion of a plan's internal claims procedure is a judicially established prerequisite to bringing a civil action under ERISA. *Diaz v. United Agricultural Employee Welfare Benefit Plan and Trust,* 50 F.3d 1478, 1483 (9th Cir.1995). The exhaustion doctrine is not explicitly set out in ERISA, but is consistent with the statute's background, structure and legislative history and serves important policy considerations, including the reduction of frivolous litigation, promotion of consistent treatment of claims, provision of a nonadversarial method of claims settlement, minimization of costs of claim settlement and a proper reliance on administrative expertise. *Id.* Federal courts have the authority to enforce the exhaustion requirement under ERISA and "as a matter of sound policy they should usually do so." *Id.,* quoting *Amato v. Bernard,* 618 F.2d 559, 568 (9th Cir.1980).

Plaintiff CCT contends there is no statutory or regulatory administrative procedure imposed by law, and no requirement under any document relating to the CCT Plan, that requires CCT to petition itself for relief prior to seeking a declaratory judgment in this court. Indeed, defendants have not identified any internal claims procedure specified by the CCT Plan which requires CCT to petition the Department of Labor for a determination of whether the Plan is exempt from ERISA and whether the 1982 Plan amendment is effective before seeking declaratory judgment in this court.[6] Therefore, plaintiff is not obligated to petition DOL regarding these issues nor await the results of DOL's pending investigation of these issues.

This matter has been under investigation by DOL since at least July of 1997, almost three years ago, without any reso-

---

6. Section 14.08 of the Revised Plan specifies an internal appeal procedure for any **partici-** **pant or beneficiary** whose claim for benefits is denied.

lution. There is no indication that DOL intends anytime soon on offering an opinion about the effectiveness of the 1982 CCT Plan amendment. Besides that, defendants concede DOL's decision would not foreclose CCT from seeking declaratory relief in this court. DOL's decision would not be binding upon this court.

If DOL was to find the CCT Plan is not exempt from ERISA, then 29 U.S.C. § 1054(g)(1) would apply to the Plan. § 1054(g)(1) provides that the accrued benefit of a participant under a plan may not be decreased by an amendment to the plan, unless approved by the Secretary of Labor (29 U.S.C. § 1082(c)(8)). There is no indication that the Secretary of Labor approved the 1982 amendment to the CCT Plan and therefore, DOL would presumably declare the amendment invalid, unless it was to find the amendment caused no reduction in accrued benefits.[7] Even so, as noted, DOL's determination would not necessarily be the end of the matter because CCT could still seek a declaration from the court that the Plan is exempt from ERISA and therefore, approval of the 1982 amendment by the Secretary of Labor was not required.

If the CCT Plan is a "governmental plan" exempt from ERISA, (and the court finds it is for reasons discussed *infra*), 29 U.S.C. § 1054(g) would not apply and Secretary of Labor approval of the 1982 amendment would not be necessary. In that case, the only issue left for resolution would be whether the 1982 amendment was properly enacted pursuant to procedures specifically set forth in the Plan or other authorization by CCT. It appears that is not an issue on which DOL would offer an opinion because it would not involve the application of ERISA and accompanying regulations. In other words, if DOL opined the CCT plan is "exempt" from ERISA, that is all it would opine. It would not go on to express an opinion as to whether the 1982 amendment was enacted in accord with procedures specified in the Plan or was otherwise properly authorized by CCT. Therefore, only this court, through the declaratory relief mechanism, would make any type of decision on that particular issue.

■ The court concludes there is a justiciable controversy and it should now consider whether declaratory relief is appropriate. The controversy is a "substantial" one, between parties having adverse legal interests, and is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Somday clearly intends on eventually applying for pension benefits and he believes the 1.5% formula should be used in calculating his benefits. He asserts the Plan was not properly amended. (Somday Dep. at p. 152). He has previously threatened litigation with CCT concerning the benefits formula. (Ex. attached to Plaintiff's Statement of Controverted Facts Re: Defendants' Motion for Summary Judgment).[8] Pursuant to 29 U.S.C. § 1132(a)(1)(B) of ERISA, Somday could bring a civil action in this court right now "to clarify his rights to future benefits under the terms of the plan."

CCT is required to fund the Plan and has been doing so since 1982 on the basis it would be paying out retirement benefits using the 1% formula. (Sections 3.01–3.03 of the Revised Plan). As of September 1995, the Plan was frozen by the Colville Business Council. CCT is in the process

---

**7.** CCT claims there was no reduction in accrued benefits because the Plan did not become effective until July 8, 1982 when Seattle Trust and Savings Bank, as Trustee, accepted the initial contribution from CCT which was based on the 1% formula, notwithstanding the 1.5% formula set forth in the Revised Plan. Therefore, even if ERISA applied to the CCT plan, CCT argues Secretary of Labor approval for the Plan amendment was unnecessary. It is not necessary for the court to address this argument because, for reasons set forth *infra*, the court finds the Plan is exempt from ERISA.

**8.** This exhibit is a January 1997 letter from Somday's counsel to counsel for CCT advising that Somday was considering an action for declaratory relief under ERISA.

of a Closing Agreement Procedure with the Internal Revenue Service. Once that process is completed, the Plan will be terminated and benefits will be distributed to participants. (Response Declaration of Gayle De La Cruz at Paragraph 6). Upon the date of either partial or full termination of the Plan, an affected participant's right to his accrued benefit is 100% non-forfeitable. (Section 18.04 of the Revised Plan).

CCT is entitled to know the extent of benefits it is obligated to pay out to Somday and other CCT employees so that CCT can budget accordingly. See *John S. Griffith Construction Co. v. United Brotherhood of Carpenters & Joiners of Southern California*, 785 F.2d 706, 713 (9th Cir. 1986) (immediate and real controversy where construction company could not adequately prepare bids for jobs until it knew status of prehire agreement with unions, including what it might be responsible for in the way of employee benefits).

■ At this point, it cannot be said with any certainty that a declaratory judgment by this court regarding the rights of Mr. Somday will have res judicata effect with regard to other CCT Plan participants and beneficiaries so as to foreclose them from bringing future legal action seeking to recover benefits based on the 1.5% formula.[9] However, as noted above, an opinion from DOL concerning the validity of the 1982 Plan amendment certainly will not foreclose future actions for declaratory relief by Plan participants and beneficiaries or by CCT. A decision by this court will be of greater significance because it will at least establish some judicial precedent regarding the validity of the amendment.

Accordingly, the court will deny defendants' motion for summary judgment. Because the issues raised by CCT in this lawsuit are ripe for adjudication, they will be addressed by the court now.

## B. Exemption of CCT Plan from ERISA

29 U.S.C. § 1321(b)(2) exempts from ERISA's coverage any plan "established and maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of the foregoing...." 29 U.S.C. § 1002(32) defines "governmental plan" as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing."[10]

In January 1983, the Pension Benefit Guaranty Corporation ("PBGC"), a body corporate established within the Department of Labor (29 U.S.C. § 1302(a)), wrote a letter to Stephen Berde Associates ("SBA") regarding the coverage status of the CCT plan.[11] (Ex. B to Carbery Declaration). This letter from PBGC was in response to an "Annual Premium Filing" submitted by CCT in July 1981 and signed by Somday. The "Annual Premium Filing" indicated the status of ERISA coverage was "uncertain." (Ex. B to Carbery Declaration).

According to the letter from PBGC:

---

9. A final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action. Res judicata bars relitigation of the same cause of action between the same parties where there is a prior judgment, whereas collateral estoppel bars relitigation of a particular issue or determinative fact. *Roper v. Mabry*, 15 Wash. App. 819, 821, 551 P.2d 1381, 1384 (1976).

10. There is not a total exemption for governmental plans, as pointed out by CCT. However, there is no dispute here that if the CCT plan qualifies as a "governmental plan," the plan is exempt from the provision requiring Secretary of Labor approval for an amendment which retrospectively decreases retirement benefits.

11. The purpose of the PBGC is to administer plan termination rules and a program of pension insurance established by ERISA.

As we understand the facts, the Indian Reorganization Act of 1934(IRA) authorized reorganization of tribal governments under a federal statutory structure. The Indians of the Colville Reservation in the State of Washington established a Constitution and By-Laws to form a recognized representative council to handle their Reservation affairs which was approved February 26, 1938.

The pension plan is a plan strictly for employees of the Tribe. The Tribe has the power to levy taxes as an aspect of its retained sovereignty which would allow the Tribe the taxing authority to make up any funding deficit incurred by the pension plan.

Based on these facts, the above plan is excluded from the termination insurance provisions of Title IV as a governmental plan under Section 4021(b)(2) [29 U.S.C. § 1321(b)(2) ] of the Act.

Accordingly, we have advised our Office of Finance to refund any premium payments made to this Corporation for the plan. . . .

As already observed, PBGC interpretations are afforded "great deference" by courts. *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1167 (11th Cir.1988); *Connolly v. Pension Benefit Guaranty Corp.*, 581 F.2d 729, 730 (9th Cir.1978) ("[T]he determination of the PBGC . . . is entitled to great deference in the construction and application of ERISA"). Indeed, courts are obligated to defer to PBGC's interpretation "[e]ven if reasonable minds could differ as to the proper interpretation of the statute." *Penn Central Corporation v. Western Conference of Teamsters*, 75 F.3d 529, 534 (9th Cir.1996), quoting *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund*, 859 F.2d 808, 813 (9th Cir.1988).

Defendants may argue that if this court is willing to defer to the PBGC determination that the CCT Plan is exempt from ERISA, then this court should also be willing to defer to a determination from DOL regarding the validity of the 1982 Plan amendment. There is no double standard here. First of all, there is, as yet, no opinion from DOL regarding the validity of the amendment. Secondly, as discussed above, if the CCT Plan is exempt from ERISA, the 1982 amendment need not have been approved by the Secretary of Labor and the only issue remaining is whether the amendment was in conformity with Plan procedures or otherwise properly authorized by CCT. That does not appear to be an issue with which DOL would concern itself. Finally, and perhaps most importantly, the defendants have not provided any reasons why this court should not give "great deference" to the PBGC determination that the CCT plan is exempt from ERISA. In order to ignore the PBGC determination, it is not enough for this court to find that "reasonable minds could differ" about the determination. Instead, this court essentially has to find PBGC is flat out wrong.

The defendants point out certain provisions of the CCT plan which refer to ERISA. Defendants suggest these provisions evidence intent by CCT not to exempt its Plan from ERISA. Article 1.06 of the Plan states:

"Employee" shall mean any employee of the Employer. However, nothing contained in this Plan, or with respect to the establishment of the Trust, or any modification or amendment to the Plan or Trust, or in the creation of any Account, or the payment of any benefit, shall give any Employee, Employee-Participant or any Beneficiary the right to continue employment, any legal or equitable right against the Employer or any Employee of the Employer, or against the Plan Administrator, or against the Trustee **except an expressly provided by the Plan, the Trust, ERISA or by separate agreement.**

(Emphasis added).[12]

Section 18 of the DRAFT Summary Plan Description deals with "Participant's

12. This provision is the same in both the     DRAFT Plan and the Revised Plan.

Rights Under ERISA," stating that "[a]s a participant in the Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA)." Those rights are then listed, including the right to file suit in state or federal court if the person's claim for benefits is denied or ignored, and the right to seek assistance from the Department of Labor or to file suit in federal court if plan fiduciaries misuse plan money or discriminate against the person for asserting his rights.

As noted above, the "governmental plan" exemption is not a total exemption from all provisions of ERISA. For example, governmental employers maintaining pension plans must file annual information returns. 26 U.S.C. § 6058; *Feinstein v. Lewis,* 477 F.Supp. 1256, 1259 at n. 4 (S.D.N.Y.1979). Therefore, that a "governmental plan" would make some reference to participant or beneficiary rights under ERISA is not necessarily inconsistent with the "governmental plan" exemption. Indeed, among the rights listed in Section 18 of the Summary Plan Description is the right to examine without charge all Plan documents and copies of documents filed by the Plan with the Department of Labor, such as detailed annual reports and the Plan description; the right to obtain copies of Plan documents and other Plan information upon written request to the Plan Administrator; the right to receive a summary of the Plan's annual financial report; and the right to obtain a statement from the Plan Administrator stating when the individual is entitled to benefits and the amount of the benefits.

Secondly, whether a "governmental plan" is exempt from ERISA depends upon the nature of the plan. When the DRAFT Plan and DRAFT Summary Plan Description were considered by the Colville Business Council in May 1981, inquiry had not yet been made of the PBGC as to whether the Plan qualified for exempt status. That was not done until early 1983. The Plan may have originally been drafted with the assumption it would be covered by ERISA. Later, the matter was clari-

fied when PBGC opined in 1983 that the nature of the Plan qualified it for the exemption.

Plaintiff CCT cites persuasive authority that the PBGC interpretation with regard to the exempt status of the CCT Plan is a reasonable one. When the PBGC sent its 1983 letter to Ms. Carbery, it had the benefit of PBGC Letter Opinion 81–3, issued March 4, 1981, which concluded that Congress did not intend to extend ERISA coverage to pension plans maintained as a function of a tribe's internal sovereignty. The plan at issue in Letter Opinion 81–3 was maintained by the tribal council for its employees. The council consisted entirely of elected governmental officials of several Indian tribes and was established to coordinate the distribution on Indian reservations of funds provided by various federal, state, and private charitable programs.

According to the PBGC in Letter Opinion 81–3:

> In utilizing the Council for the purpose of collaborating with federal assistance programs, the Tribes are acting as sovereign nations. The authority to structure the Council's relationship with its employees is an undoubted attribute of the Tribes' sovereignty. Title IV's provisions would, if applied to the Plan, palpably affect the relationship and thereby, to some degree, circumscribe the exercise of that sovereignty. The Title should not be presumed thus to limit the Tribes' exercise of their sovereign powers in the absence of specific language stating that intent. The Act contains no such specific language.

This is essentially the rationale the PBGC relied upon in 1983 when it opined the CCT Plan was exempt from ERISA.

In November 1989, the PBGC issued Letter Opinion 89–9. That opinion pertained to a pension plan of which a Native American tribe assumed sponsorship after it purchased a factory. The factory was located outside of the tribal reservation. The tribe continued to operate the factory and directly employed the factory's em-

ployees, most of whom were non-Indians and represented by a union. The factory's customers, at least some of which were in other states, were non-Indian, and the factory was run simply to make money for the tribe.

The PBGC concluded the tribe pension plan did not qualify for exempt status. The PBGC found the operation of the factory and the maintenance of the pension plan for the employees were not aspects of tribal self-government and therefore, that ERISA coverage would not interfere with tribal sovereignty. The PBGC supported that finding by noting, among other things, that the factory was an off-reservation operation; it was operated to generate income for the tribe; and most of its employees and all of its customers were non-Indian.

The PBGC carefully distinguished these circumstances from the circumstances which existed with regard to the tribe pension plan which had been the subject of Letter Opinion 81–3:

> This case is significantly different from that presented in Opinion Letter 81–3, where the PBGC concluded that Title IV did not govern a pension plan for employees of a corporate council of elected governmental officials of several Indian tribes that was established to coordinate the distribution on Indian reservations of federal (and, to some degree, state and private charitable) funds. In Opinion Letter 81–3, for example, the activities covered by the plan were characteristically governmental, non-profit activities focused within the reservation. Here, in contrast, the operations of the factory are off-reservation commercial activities carried on to make a profit.

This court has found no caselaw which disagrees with PBGC analyses pertaining to tribal pension plans. Letter Opinion 89–9 was issued after the decision by the Seventh Circuit in *Smart v. State Farm Insurance Co.*, 868 F.2d 929 (7th Cir.1989). In that case, the plaintiff commenced an action alleging State Farm had failed to pay a claim for medical expenses under a group insurance policy issued by State Farm to employees of the Chippewa Health Center which was owned and operated by the Chippewa Tribe. Plaintiff was an employee of the health center.

The issue was whether Congress intended ERISA to include an employment benefit plan established and maintained by an Indian Tribe employer for the benefit of Indian employees working at an establishment located entirely on an Indian reservation. The Seventh Circuit found that ERISA did apply, rejecting plaintiff's argument that application of ERISA would interfere with the tribe's right of self-governance in intramural matters. The circuit noted that the activity underlying the challenge to ERISA was "the Tribe's subscription of services and pooling of risks with State Farm, **an outside, non-Indian agent.**" 868 F.2d at 936. (Emphasis added).

The Seventh Circuit also rejected plaintiff's contention that the exemptions provided for state and local governments indicated an unwillingness by Congress to have ERISA apply to sovereigns generally and therefore, that Indian tribes should be similarly exempt. The court found there was no clear evidence of congressional intent to exempt tribes. According to the court:

> The analogy is particularly inapt given the significant differences between states and their political subdivisions on one hand and Indian Tribes on the other.... Significant concerns of federalism, peculiar to Federal–State relations, account for federal deference to the autonomy of state government. Federalism uniquely concerns States; there simply is no Tribe counterpart. [Plaintiff] is unable to point to any evidence of congressional intent that ERISA is not applicable to Tribe employers and Indians.

868 F.2d at 936.

As plaintiff CCT points out, the Seventh Circuit in *Reich v. Great Lakes Indian*

*Fish & Wildlife Commission,* 4 F.3d 490, 495 (7th Cir.1993), subsequently criticized what it referred to as its "dictum" in *Smart* that federalism uniquely concerns States and there is no Tribe counterpart. In *Reich,* the Seventh Circuit stated this "dictum" had gone too far:

> Indian tribes, like states, are quasi-sovereigns entitled to comity. Comity argues for allowing the Indians to manage their own police as they like, even though no treaty confers such prerogatives, until and unless Congress gives a stronger indication than it has here that it wants to intrude on the sovereign functions of tribal government.

*Id.*

The circumstances in *Smart,* an Indian tribe operating a business employing Indians on the reservation and the tribe's subscription of services and pooling of risks with an outside, non-Indian agent, are clearly distinguishable from the circumstances existing with regard to the CCT Plan. This is recognized by PBGC in its 1993 letter to CCT and in its Letter Opinion 89–9.

In *Lumber Industry Pension Fund v. Warm Springs Forest Products Industries,* 939 F.2d 683 (9th Cir.1991), the plaintiff commenced an ERISA action to recover pension contributions from the defendant. The defendant was a tribally owned and operated sawmill located on the reservation. The mill was a signatory to a collective bargaining agreement with the Lumber and Sawmill Workers Union which required the mill to make pension contributions on behalf of its employees to the Lumber Industry Pension Fund. The mill eventually stopped making contributions to the Lumber Industry Pension Fund and instead began making contributions to the tribal pension plan.

The Ninth Circuit concluded that ERISA applied to the tribe considering the particular circumstances. The circuit found that application of ERISA would not interfere with the tribe's right of self-governance in a purely intramural matter. While permitting the Lumber Industry

Pension Fund to sue the mill under ERISA would subject the mill to possible liability for money damages, it would not usurp the tribe's decision-making power. The tribe was free to form and operate a tribal pension plan and the mill was free to transfer its employees to that plan at the end of the term of the collective bargaining agreement. However, by transferring its employees to the tribal plan before the bargaining agreement expired, the mill exposed itself to possible liability for unpaid contributions to the Lumber Industry Pension Fund. The mill was not protected from such liability under the self-government exception. 939 F.2d at 685.

The circuit also rejected an argument by the mill that it could not be compelled under ERISA to pay contributions to the Lumber Industry Pension Fund because of a tribal ordinance mandating that it transfer its tribal-member employees to the tribal pension plan. The circuit found that ERISA did not encroach on the tribe's right of self-governance in passing or enforcing the ordinance. The ordinance required that all retirement plans covering tribal member employees of tribal enterprises provide benefits at least as favorable as those of the tribal plan. Application of ERISA would not inhibit tribal employees of the mill from joining the tribal plan. *Id.*

As with *Smart,* the circumstances in *Lumber Industry Pension Fund* are distinguishable from the circumstances involving the CCT Plan, as explained in the PBGC's 1983 letter to CCT and PBGC's Letter Opinion 89–9. *Lumber Industry Pension Fund* involved a tribal commercial venture which entered into a collective bargaining agreement with a union which obligated the tribal commercial venture to contribute to that union's pension fund.

There is no compelling reason why this court should not give deference to PBGC's 1983 determination that the CCT Plan qualifies for the "governmental plan" exemption. Accordingly, the court will de-

clare that the CCT Plan falls within that exemption.

## C. Validity of 1982 CCT Plan Amendment

Mr. Somday claims it is only during the course of this litigation that he became aware of an amendment "purportedly made to the plan reducing the defined benefit level from 1.5% to 1%." According to Somday, he has no personal recollection of such an amendment and believes no formal resolution adopting such an amendment was ever adopted by CCT as required by the Plan. Without a formal resolution, Somday asserts the amendment is invalid. (Somday Declaration at p. 3; Ct. Rec. 47).

Somday does not specifically controvert many of the facts recited in CCT's statement of material facts regarding the history of the CCT Plan, including the 1982 amendment thereto; Somday's involvement in administration of the Plan; and Somday's receipt of information that benefits (including his own) were being calculated based on a 1% formula. Somday does not offer specific arguments in opposition to CCT's arguments that the amendment is valid. Instead, Somday contends CCT's "exhaustive discussion of these issues raises genuine issues of material fact that argue against CCT's own Motion for Summary Judgment."

### (1) Terms of the Plan

Paragraph 17.01 of the Plan is labelled "EVIDENCE." It is found under "ARTICLE XVII–MISCELLANEOUS." (Ex. A to Declaration of Gayle De La Cruz). This paragraph provides in relevant part:

Any **action required** of the Employer [CCT] shall be by resolution of the Colville Business Council, or by a person authorized by resolution of the Colville Business Council.

(Emphasis added). Apparently it is this provision upon which Somday relies in asserting that a business council resolution was a prerequisite for any amendment.

Paragraph 18.02 of the Plan pertains to "AMENDMENT BY EMPLOYER." It states:

The Employer shall have the right at any time and from time to time:

(a) To amend this Agreement in any manner it deems necessary or advisable in order to qualify (or maintain qualification) of this Plan and the Trust created under it under the appropriate provisions of the Code;

(b) To amend this Agreement in any other manner. However, no amendment shall authorize or permit any of the Trust Fund (other than the part which is required to pay taxes and administration expenses) to be used for or diverted to purposes other than for the exclusive benefit of the Participants or their Beneficiaries or estates. No amendment shall cause or permit any portion of the Trust Fund to revert to or become a property of the Employer; and no amendment which affects the rights, duties or responsibilities of the Trustee, the Plan Administrator or the Advisory Committee may be made without the written consent of the affected Trustee, the Plan Administrator or the affected member of the Advisory Committee.

The Employer shall make all amendments in writing. Each amendment shall state the date to which it is either retroactively or prospectively effective.

"Amendment One" (Ex. E to Declaration of Gayle De La Cruz) specifically invoked "the right of amendment reserved to the Employer in Article XVIII, Section 18.02 of the COLVILLE CONFEDERATED TRIBES EMPLOYEES' RETIREMENT PLAN . . . ." "Amendment One" states the date on which each of the "items" is effective. Item 7 pertaining to the change in the benefit formula is deemed effective as of July 1, 1980. At the top of the last page of "Amendment One" it states that "[i]n all other respects, the COLVILLE CONFEDERATED TRIBES EMPLOYEES' RETIREMENT PLAN is hereby ratified and confirmed." "Amendment One" is dated December 21,

1982 and signed on behalf of the "Employer" by Al Aubertin who was then the Chairman of the Colville Business Council.

Plaintiff CCT does not dispute that there was not a formal resolution adopting the 1982 amendment, but claims it was unnecessary. According to plaintiff, an amendment, "which is optional by its nature, ... does not involve any 'action required' of CCT." Therefore, plaintiff contends "Amendment One" was not subject to Paragraph 17.01 of the Plan which states that "[a]ny action required of the Employer shall be by resolution of the Colville Business Council, or by a person authorized by resolution of the Colville Business Council."

It is not readily apparent that any amendment to the Plan would be one of the "required" actions contemplated by Paragraph 17.01. Certainly, CCT felt the amendment was appropriate because of then existing circumstances, but that does not mean the amendment was absolutely essential.

■ Paragraph 18.02 states the employer has a "right" to amend the Plan at any time and from time to time, not that it has a duty or an obligation to amend the Plan. Furthermore, Paragraph 18.02 carefully delineates limits on the employer's amendment power. Because of this carefully circumscribed amendment power, it is reasonable to infer that a business council resolution for an amendment to the Plan was unnecessary.

**(2) Ratification of Amendment by Business Council**

Ratification is the subsequent adoption and affirmance of an act which was done without authority. Ratification causes the previous act to be binding as if such was valid and enforceable in the first instance.

*Northwest Poultry & Dairy Products Co. v. A.C. Fry Co.,* 27 Wash.2d 35, 54, 176 P.2d 324, 334 (1947). Ratification can be express or implied.

In the alternative, CCT contends a formal resolution by the council was unnecessary because the amendment was ratified by the council's passage of annual budgets making CCT contributions to the Plan based on the 1% formula.[13] Somday does not dispute that CCT contributions since 1982 were based on the 1% formula.

The first contribution to the trust was by a check in the amount of $222,575.63, dated June 29, 1982. (Ex. A to Supplemental Declaration of Gayle De La Cruz; Ex. G to Declaration of Gayle De La Cruz). Somday had been informed by Stephen Berde Associates that the minimum contribution was $273,523.00. (Ex. D to Declaration of Stephen Berde). Stephen Berde, by cover letter dated July 2, 1982, sent an actuarial valuation of the CCT Plan to Somday explaining that this minimum contribution (page 10 of valuation) was based on the 1% formula. A summary of the Plan was included along with the valuation. A section discussing "RETIREMENT BENEFIT" (page 14) states the monthly normal retirement benefit is the actuarial equivalent of a life annuity which is equal to 1.0% of the participant's average monthly compensation. There is an asterisk placed next to the "1.0%" for which the following explanation is offered: "based on verbal change from percentage stated in plan document."[14] (Ex. E to Declaration of Stephen Berde).

■ Of significance is that the June 29, 1982 check coincided with a June 29, 1982 Colville Business Council resolution (1982–391) which approved a Fiscal Year 1982 extended budget for CCT. (Ex. C to Declaration of Michael G. Black).[15] This is a

---

13. There is no dispute that the Colville Business Council must authorize the annual tribal budget via the resolution process. (Somday Dep. at pp. 56; 63–65, Ex. A to Declaration of Michael G. Black; Letter from Somday to Department of Labor, Ex. B to Declaration of Michael G. Black).

14. This letter was sent out before Amendment One was signed on or about December 21, 1982.

15. An extended budget was necessary since the CCT fiscal year had been changed and instead of ending on June 30, now ended three months later on September 30.

compelling indication that the business council intended to ratify the 1982 Plan amendment which was eventually formalized by Amendment One executed in December 1982.

The court finds preposterous Somday's claim that he only became aware of the "purported" amendment during the course of this litigation, especially considering his status as Secretary of the Plan Advisory Committee and as Executive Director for CCT.[16] The documentary evidence clearly establishes otherwise. One example is the July 2, 1982 letter from Berde to Somday referred to above. Below are some other examples.

In July of 1984, Christine Carbery[17] sent an actuarial valuation to Somday. Appendix A to the valuation was a "Summary of Plan Provisions July 1, 1983." The appendix indicates that the plan was initially effective July 1, 1980 and was most recently amended effective December 21, 1982. With regard to retirement benefits, Appendix A indicates that each participant shall be entitled to receive a monthly benefit based on the 1% formula which is consistent with the amendment. (Ex. L to Declaration of Christine Carbery). Somday does not deny receiving this actuarial valuation from Carbery.

In April 1985, Stephen Berde sent a letter to Somday discussing the eligibility of an Edgar L. Desautel for retirement benefits. In that letter, Berde explained that Desautel was not eligible because he was hired at age 65, which is the normal retirement age under the CCT Plan and the age at which benefits stop accruing. Berde further explained:

> In 1982 the plan was amended to exclude employees hired after age 59.

However, this amendment in no way affected Mr. Desautel because he had already been excluded by the terms of the plan. Thus, he was never eligible to enter or join the plan.

(Ex. F to Declaration of Stephen Berde). Somday does not deny receiving this letter.

In January of 1986, Christine Carbery sent a letter to Lois Abrahamson of the CCT Personnel Office[18] explaining the years of service counted for purposes of retirement benefits under the Plan:

> The plan states in Section 5.02 (**refer also to amendment one**) that a participant's retirement pension is equal to **one percent (1%)** of the participant's average monthly compensation multiplied by his years of service with the Tribe. Year of service for purposes of retirement benefits means a 12–month period from July 1 to June 30 in which the employee completes 1,000 hours of service. Years prior to 1970, however, are not included.

(Emphasis added). Carbery's letter indicates a copy thereof was also sent to Somday. (Ex. P to Declaration of Christine Carbery). Somday does not deny receiving a copy of this letter.

A March 7, 1986 memorandum from Somday, in his capacity as Secretary of the Advisory Committee, addressed to his fellow advisory committee members, includes an attached document ("EMPLOYEE NOTICE") proposed to be distributed to tribal employees to provide them with information concerning the CCT Plan. The document discusses the amendments made in 1982, including eligibility to participate in the Plan only if hired before age 60.

---

**16.** In his resume, Somday indicates he was Executive Director of the CCT from 1978 to 1986 and that one of his "Major Accomplishments" was that he "[e]stablished the Employees and Business Council members Pension Plans." (Ex. H to Declaration of Michael G. Black).

**17.** Carbery initially was employed by Stephen Berde Associates which merged with Howard Johnson & Company in 1983. Howard Johnson & Company administered the CCT Plan until 1985. (Declaration of Stephen Berde).

**18.** At his deposition, Somday acknowledged the "Plan Administrator" was CCT, specifically the Personnel Office which was under Somday's jurisdiction as the executive director. (Somday Dep. at pp. 51–52; Ex. A to Declaration of Michael G. Black).

(Ex. D to Declaration of Michael G. Black).[19]

Somday's writing appears on other copies of this "EMPLOYEE NOTICE." On one copy, Somday's initials appear, along with a date of "2–13–86" and a notation that "Phil is re-drafting." (Ex. G to Declaration of Michael G. Black). On another copy, bearing a "ROUGH DRAFT" stamp, Somday wrote his initials and "3–13–86" at the top of the document. (Ex. F to Declaration of Michael G. Black).[20]

On or about April 28, 1986, Lois Abrahamson sent a memo to Somday to which was attached a proposed replacement to the CCT Employee Retirement Plan Summary. This summary refers to the 1% formula. (Ex. E to Declaration of Michael G. Black). Somday does not deny that he received this memorandum.

Somday does not dispute that Christine Carbery from SBA sent him "Termination Worksheets" for the purpose of determining benefits for Plan participants. According to Carbery, if benefits were to be paid, Somday approved payment by signing Termination/Retirement Notices in his capacity as Secretary of the Advisory Committee. These documents calculated benefits based on the 1% formula. (Carbery Declaration at pp. 7–8; Exs. J, K and M attached to Declaration).

These examples of Somday's knowledge of the amendment are important because they most clearly reveal that the Plan was funded for years upon the 1% formula and that the Colville Business Council effectively ratified the amendment by passing budgets year after year which allocated employer contributions to the Plan based on the 1% formula.

### (3) Implied Authority to Enact the Amendment

■ Implied authority is actual authority, circumstantially proved, which the prin-

cipal is deemed to have actually intended the agent to possess. *King v. Riveland*, 125 Wash.2d 500, 507, 886 P.2d 160 (1994).

Plaintiff CCT contends Al Aubertin had implied authority conferred upon him by the Business Council to execute the 1982 amendment and therefore, a formal resolution was unnecessary. Plaintiff contends numerous actions were taken without a written resolution, including adoption of the Plan itself, substitution of individual trustees, and appointment of the Advisory Committee. According to plaintiff, if a resolution was required for adoption of the Plan, the absence of a resolution means there is no Plan. Somday does not contend the Plan itself was not properly implemented, only that the amendment thereto was not properly implemented.

The uncontroverted material facts are that the Revised Plan was executed on June 29, 1981 by Al Aubertin on behalf of the "Employer;" that the Revised Plan substituted individual trustees for Seattle-First Bank as trustee; that the "Appointment of Advisory Committee" form was also executed on June 29, 1981. However, the archival records of the CCT show there was no council meeting between June 24, 1981 and June 30, 1981.[21] The Revised Plan and Appointment of the Advisory Committee were ostensibly authorized by a Surrogate Resolution 1981–423 which was prepared by Stephen Berde Associates, but this surrogate resolution is not a part of the official records of the Colville Business Council. (Ex. C to Declaration of Gayle De La Cruz).

The surrogate resolution, although bearing a date of May 18, 1981, is not the same as the original resolution which bears the same date. The surrogate resolution (Ex. C to De La Cruz Declaration) appointed an Advisory Committee, whereas the original resolution (Ex. A to Cawston Declara-

**19.** The document bears a scratched out typewritten date of January 27, 1986.

**20.** Both of these copies of the memo bear a typewritten date of January 27, 1986.

**21.** Stephen Berde says he sent these documents to Somday on June 24, 1981.

tion) did not. This Advisory Committee clearly came into operation as evidenced by Somday's use of the title "Advisory Board Secretary" on January 1985 correspondence to Seattle Trust and Savings Bank (Ex. I to De La Cruz Declaration), and his use of the title "Secretary of the Advisory Committee" on internal memoranda to other advisory committee members in 1986. (Ex. K to De La Cruz Declaration).[22]

As plaintiff points out, the appointment of an Advisory Committee under the terms of the Revised Plan was an "action required" by the employer (CCT). Section 15.01 of the Revised Plan states that "[t]he Employer shall appoint an Advisory Committee to administer the Plan." Section 17.01, of course, states that "[a]ny action required of the Employer shall be by resolution of the Colville Business Council, or by a person authorized by the Colville Business Council." There is no indication that Surrogate Resolution 1981–423 was actually considered by the business council or that any subsequent resolution passed by the business council formally appointed the Advisory Committee members.

■ The court agrees that the operation of the Advisory Committee to administer the Revised Plan shows the business council conferred implied authority upon Aubertin to appoint the Advisory Committee members and/or that the Council ratified the appointment of those members. Therefore, it is no great stretch to find the council did the same with regard to the 1982 Plan amendment.

The Revised Plan was clearly implemented and therefore, it is a reasonable conclusion that the council conferred authority upon Aubertin to sign the Revised Plan. In turn, it is also reasonable to conclude that the Council conferred authority upon Aubertin to execute the 1982 amendment, assuming Aubertin in fact needed council approval for the amendment. There is strong circumstantial evidence that the Council approved the amendment despite the absence of a formal resolution. Official tribal records show that a council meeting occurred on December 21, 1982, the date found on the amendment.[23]

If there was no resolution to implement the Plan itself, one must ask why it would have been necessary that there be a resolution in order to amend the Plan. There is no authority cited (i.e., tribal constitutional provision or other tribal law) that a resolution was required to enact the Plan itself. Although the business council did pass a resolution in conjunction with the DRAFT Plan, that plan was never signed.

## V. CONCLUSION

The issues raised by CCT in its complaint are ripe for judicial resolution. CCT is not required to exhaust any administrative remedies.

The only inferences or conclusions which can be drawn from the documentary evidence presented in this case are: 1) the CCT Plan is exempt from ERISA as a "governmental plan;" and 2) the Plan was validly amended in 1982 either by a) the terms of the Plan itself; or b) ratification by the Colville Business Council; or c) implied authority conferred upon Al Aubertin, Chairman of the Colville Business Council; or d) some combination of the latter two (ratification and implied authority).

---

**22.** The duties of Advisory Committee are set forth in Section 15.04 of the Revised Plan and include determining the rights or eligibility of an employee to participate in the Plan; direct the Trustee as respects crediting and distribution of the Trust; review and render decisions respecting a claim for benefits; and engaging investment managers. Pursuant to Section 15.05, the Advisory Committee is responsible for establishing the funding policy of the Plan.

**23.** Carbery says she put this date on the amendment after it was received by SBA from the Tribe. She says she contacted Tribal officials who told her this was the date the amendment had been executed. (Declaration of Christine Carbery).

Accordingly, the court hereby **GRANTS** plaintiff CCT's motion for summary judgment (Ct.Rec.32) and **DENIES** defendants' motion for summary judgment (Ct. Rec.44). The court hereby **DECLARES** (1) that the CCT Plan is exempt from ERISA as a "governmental plan;" and (2) that Mr. Somday's retirement benefits are properly calculated based on the 1% formula.

**IT IS SO ORDERED.** The Clerk of the Court shall enter judgment accordingly and forward copies of the judgment and this order to counsel.